STEEL WHEEL CORPORATION v. B. F. GOODRICH RUBBER CO.

District Court, E. D. Michigan, S. D.    June 14, 1928.

No. 2008.

1. Patents ☞328—1,537,879, claims 1 and 2, for pneumatic-treaded vehicle wheel, claimed to cover balloon tire, held void.

Putnam patent, No. 1,537,879, claims 1 and 2, for pneumatic-treaded vehicle wheel, claimed to cover balloon tire, held invalid because anticipated.

2. Patents ☞328—Claims 1 and 2 of 1,537,879, for pneumatic-treaded vehicle wheel, specifying substantial changes from standard practice in tires, held void for indefiniteness (35 USCA § 32).

Claims 1 and 2 of patent No. 1,537,879, for pneumatic-treaded vehicle wheel, specifying substantial changes in cross-sectional area in tire and substantially reduced inflation pressure, as distinguished from "standard practice," held void for indefiniteness and uncertainty, under Rev. St. § 4888 (35 USCA § 33; Comp. St. § 9432).

3. Patents ☞160—File wrapper of patent can be used only to interpret language of patent, when susceptible of different legitimate meanings, and not to remedy patent's indefiniteness.

File wrapper of patent has no probative force, and can be used only to interpret the language of the patent, when susceptible of two different, but legitimate, meanings, or to estop patentee from asserting for claim a construction inconsistent with its history, and file wrapper is inadmissible to remedy lack of definiteness in patent itself.

In Equity. Patent infringement suit by the Steel Wheel Corporation against the B. F. Goodrich Rubber Company. Bill of complaint dismissed.

Frank Parker Davis and Lewis T. Greist, both of Chicago, Ill., Whittemore, Hulbert, Whittemore & Belknap, of Detroit, Mich., and Oscar W. Jeffery, of New York City (W. J. Belknap, of Detroit, Mich., of counsel), for plaintiff.

Merrell E. Clark, of New York City (Charles Neave, of New York City, Robert M. Pierson, of Akron, Ohio, and Swan & Frye, of Detroit, Mich., of counsel), for defendant.

TUTTLE, District Judge. This suit involves the Putnam patent, No. 1,537,879, for pneumatic-treaded vehicle wheel. The application for this patent was filed August 13, 1920. The patent was issued May 12, 1925.

Late in 1923 or early in 1924, the so-called "balloon" tire became generally adopted by the automobile industry, and practically all passenger automobiles now being manufactured are equipped with such tires. The plaintiff contends that the Putnam patent covers these "balloon" tires. An idea of the scope contended for this patent by the plaintiff is found in the plaintiff's bill of particulars in this case, in which it is alleged that every one of the more than 50 different sizes and constructions of "balloon" tires, which the defendant was selling in April,

1927, at the time of the filing of the bill of complaint in this case, infringes claims 1 and 2 of the patent. These two claims are the only ones relied upon by the plaintiff, claim 3 having been withdrawn.

There is not the slightest doubt in my mind as to the value of the "balloon" tire in the way of comfort, economy, and length of tire life. If we disregard the intermediate steps which have occurred and compare the wide, soft, easy-riding "balloon" tire of to-day, with the narrow, highly-inflated, hard-riding tire of yesterday—and by "yesterday" I mean a time far enough back to avoid all contentions and disputes, and all prior uses, prior publications, and prior patents in this record—we cannot fail to be impressed with the great practical importance of the advance that has been made. Had that advance been made in a single step, and as a result of a discovery disclosed in a patent, there could be little doubt of the presence of the inventive genius in that discovery, or of the validity of that patent.

However, the advance to the "balloon" tire has not been made in a single step, but step by step, as the industry has developed, and the Putnam patent here sued upon discloses no "discovery" whatever, but merely what was well known in the art, and repeatedly published during more than a decade preceding Putnam's application date. [1] The disclosure of the Putnam patent comes down to this: Increased comfort in riding can be obtained by the use of lower inflation pressures in the tires. Lower inflation pressures may be employed in tires for carrying a given load without shortening the life of the tires, if the cross-sectional diameter of the tires is increased and the side walls are so constructed as to permit the necessary flexion. If the use of lower inflation pressures is thus made possible, thinner side walls may be used, because less strength of the side wall is required to hold air at low pressure than is required to hold air at high pressure; also, thinner side walls are less subject to destructive heat, as the result of flexing, than are thicker ones.

All of this was old in the art, and is disclosed in numerous of the prior publications and patents offered by the defendant. Any one who has ever driven an automobile knows that improved riding qualities are obtained by decreasing the inflation pressures in the tires. If this decease in inflation pressure is effected without increasing the width of the tire, it means that the flexing of the side walls of the tire will be increased, perhaps to a point where the life of the tire is ma-

terially reduced. On the other hand, if the width of the tire for a given load is materially increased, the inflation pressure may be materially reduced without increasing the degree of flexing of the side wall of the tire, and therefore without shortening the tire life. This fact and the reasons underlying it have long been known. See, for example, the article entitled "Some Reasons for Large Tyres" at pages 804, 805, of the Automotor Journal of November 4, 1915.

In addition to setting forth these well-known principles, the Putnam patent suggests a degree of increase of tire width which is far beyond anything that has come into actual use up to the present time, and far beyond anything that is represented by the defendant's alleged infringing tires.

One of the first to make practical use of the advantages to be derived from relatively wide pneumatic tires or correspondingly reduced inflation pressures, was the Palmer Tyre, Limited, a British concern, whose product was known as the Palmer cord tyre. Beginning as early as 1908, the literature published by this company, and the trade journals in England and in America, described, in language which would be equally applicable to the present day "balloon" tire, the great improvement in riding qualities attained by the use of wide, soft, Palmer tires. Those tires were made for touring cars, according to the literature and to the testimony which has been taken in this case, in sizes as large as 7 inches, which is substantially the same size as the so-called "balloon" tire now being used on our heaviest passenger cars. This Palmer literature is also full of references to the fact that the Palmer tire has thinner side walls than competing tires, and therefore is less subject to destructive heating as the result of the flexing of the tire walls.

I cannot discover one single thing in the Putnam patent that is not disclosed in these articles about the Palmer cord tyre. They certainly tell of the wide tire, the low air pressure, and the thin side walls, and they emphasize the reason why thin side walls are desirable.

As against these Palmer publications, the plaintiff urges that the proofs show that the side walls of the Palmer tire, though relatively thin, were as a matter of fact, constructed in such a way that they did not stand up well under substantial flexing. The proofs are conflicting in this regard. But, irrespective of the actual properties of the Palmer tire, the articles relating to that tire disclosed fully the kind of a side wall that is

needed—just as fully as Putnam did in his patent—and came just as near telling the world how to build a tire with such a side wall as Putnam did. Indeed, Putnam tells us absolutely nothing about the actual construction of the tire. There is not even a suggestion in his patent as to the character of the fabric to be used, or as to the number of plies, or as to the amount or disposition of the rubber. No mention is made of breaker strips, or of flippers, or of chafing strips. Perhaps Putnam could safely leave matters of construction to the skill of the tire maker. Then the same can be said for the authors of the Palmer articles. Certainly the publications relative to the Palmer tire teach the tire maker fully as much about the construction of a wide, soft, thin tire as does the Putnam patent.

The plaintiff urges that the Palmer publications are not as full a disclosure as the Putnam patent because, at the time of those publications, the tire-making art had not progressed to a point where the Palmer disclosure was sufficient to enable the tire maker to produce satisfactory tires having the properties described, whereas, at the time of Putnam's identical disclosure, the tire art had progressed to such a point that that disclosure was sufficient. A patent cannot be upheld on that theory. The mere repetition of a prior published disclosure cannot form the basis of a valid patent, merely because the art has advanced to such a point that at the time the patent repeats the disclosure it becomes useful.

As I have said, I discover absolutely nothing in the Putnam patent that is not fully and clearly disclosed in the prior publications relative to the Palmer cord tyre. I hold, therefore, that the Putnam patent is invalid, because it is anticipated by these publications.

In addition to the publications relative to the Palmer tire, the record in this case shows commercial use of the Palmer 7-inch tires in England as illustrative of what is described in the publications about those tires. And it shows also that two of these 7-inch Palmer tires were imported into this country and used on the rear wheels of a Peerless car in 1910 by Mr. A. H. Marks, who was then connected with the Diamond Rubber Company in Akron. The fact that those two 7-inch Palmer tires were purchased and used by Mr. Marks on his car in 1910 is just as certain as anything ever can be in a lawsuit. It has been proved with great accuracy and great care, and I have no doubt at all about the purchase of those tires, or their use on the car at comparatively low inflation pressures, or as to the comfort which they gave. The testimony shows that those tires were used on Mr. Marks' car every day for a period of two or three months, and were subjected to the hardest kind of service.

In view of the other defenses in this case, it is unnecessary to decide whether the use of these two 7-inch Palmer tires by Mr. Marks, for several months in 1910, would, of itself, be a sufficient reduction to practice and use of the thing patented by Putnam, to defeat that patent. But, in any event, that use is available as explanatory of, and as justification for, the Palmer articles to which I have already referred. The proofs concerning the particular 7-inch tires which Mr. Marks used, and the fac simile section of those tires which is in evidence, show how wide and comparatively thin those tires actually were. Indeed, they show that the Palmer 7-inch tires which are referred to in the articles were in fact of substantially the same dimensions, both in width and in side wall thickness, as the so-called "balloon" tires used to-day on the heaviest passenger cars.

In referring above to the publications relating to the Palmer tires, I include all of those publications contained in group I of the volume, defendant's Exhibit 128. Among these publications is one which refers only casually to the Palmer tires, and which has therefore been discussed by the defendant independently of the Palmer tire. I refer to the article in the Motor of December 24, 1912, pp. 1036, 1037, which points out that a 90mm. tire (3½-inch) if used to carry a given load, must be inflated to 80 pounds per square inch, whereas a 175 mm. tire (7-inch), when used to carry the same load, requires an inflation pressure of only 40 pounds per square inch. It also points out that by reason of the reduction in inflation pressure from 80 to 40 pounds per square inch the side walls of the 7-inch tire may be of lighter construction than those of the 3½-inch tire. This single publication, quite aside from its reference to the Palmer tire, constitutes a complete anticipation of the Putnam patent.

In addition to the publications to which I have already referred, there are a mass of publications contained in group II, defendant's Exhibit 128, which show a full realization on the part of the industry of the relationship between tire width, inflation pressure, and side wall thickness, to which Putnam refers in his patent. It is unnecessary here to refer to them in detail. I may men-

tion in passing, however, that it seems to me that the article in the Light Car of September 29, 1914, pp. 32, 33 (particularly page 33), discloses everything that Putnam disclosed in his patent application six years later with reference to wide, soft, thin tires.

I will also mention briefly the Hawley patent, No. 1,433,008, issued October 24, 1922. This patent was applied for December 10, 1917, nearly three years prior to the Putnam application, and therefore is, under the decision in Milburn Co. v. Davis Bournonville Co., 270 U. S. 390–402, 46 S. Ct. 324, 70 L. Ed. 651, available as a defense to show that Putnam was not "the first and original inventor or discoverer of any material and substantial part of the thing patented." This Hawley patent discloses fully the very advantages of a wide, thin, soft tire which are claimed for the Putnam tire by the plaintiff in this case. It is true that the two Putnam claims in suit specify that the tire shall be substantially circular in cross-section, and that the Hawley tire is elliptical, rather than circular. This, however, is merely a change in shape or form, and, in the absence of any showing in this record of a difference in function or operation between circular and elliptical tires, it does not seem to me that the mere difference in shape or form is sufficient to distinguish the Putnam claims from the Hawley disclosure.

Again, there is the French patent to Perrot, No. 489,671, which was published March 1, 1919, over a year before Putnam's application was filed. One of the particular advantages claimed by the plaintiff for the wide, soft, thin tire disclosed in the Putnam patent is that it affords increased traction in driving over soft ground. It is this particular advantage of wide, soft, thin tires that is emphasized in this French patent. The disclosure in this French patent, with reference to the proportions of the tire and its inflation pressure, is that the tire may be twice as large as the normal tire, that it may carry from one-fourth to one-eighth of the normal inflation pressure and that in spite of its increased width, and *because* of its decreased inflation pressure, its side walls are preferably made very much thinner than in the normal tire. This prior patent, which may be considered as a prior publication, seems to me to constitute an additional anticipation of the Putnam patent.

A further anticipation of the Putnam patent is found in the early use by Ralph K. Mulford on his small cars of 26″ x 5″ Goodyear airplane tires, and 26″ x 5″ Braender motor car tires, which uses began, respectively, in 1917 and 1919. I would defeat this Putnam patent on what Mulford did, alone, even in the absence of all the prior publications to which I have referred. What Mulford did is proved in such a convincing way that I have no doubt about it at all. I have no more doubt that Mulford got those airplane tires and put them on his car in 1917 than I have that Putnam applied for the patent in suit and got it allowed. The same applies to Mulford's obtaining and using, in 1919, the Braender tires of the same size as the airplane tires which he had previously used.

The particular airplane tires which Mulford used in 1917 have been produced in court, as have certain of the Braender tires, whose date of manufacture has been established as prior to September 1919. Mulford's two cars, the Mulford special sedan, which he equipped with the airplane 26″ x 5″ tires in 1917, and re-equipped with Braender 26″ x 5″ tires in 1919, and his small Opel car, which he equipped with Braender 26″ x 5″ tires in 1919, have been exhibited to me, and I have ridden in both of those cars equipped with Braender 26″ x 5″ tires, some of which were made at least as early as 1919. The riding of those cars, equipped with those 26″ x 5″ tires, as I experienced it, can best be described as the riding one would expect from the use of what we now know as "balloon" tires.

Referring first to the use of 26″ x 5″ Goodyear airplane tires on the Mulford special sedan, it is clear that those tires, measuring substantially 5″ in cross-section, were considerably wider than the tires commonly used on comparable cars in 1920. They were relatively thinner, having approximately the same side wall thickness as the thinnest "balloon" tire of to-day, and I am convinced that they were placed by Mulford on his car for use at low inflation pressures to give easy riding and that they were so used by him.

These airplane tires, as the tire section in evidence shows, had extremely flexible and durable side walls. From that standpoint they were magnificent tires for use at low inflation pressures. The plaintiff objects to them because their treads were not particularly durable for use on automobiles, and were of smooth rather than nonskid construction. This objection does not impress me. Mulford knew, and every one knew, that, for maximum durability and for immunity from skidding, the tires should have thicker treads of nonskid construction. But we must take into consideration the practical

impossibility of obtaining quickly and easily nonskid tires of the size and construction that Mr. Mulford wanted. These airplane tires demonstrated completely what Mulford wanted to demonstrate, namely, that wide, soft, thin tires would give vastly improved riding qualities to a car. His use of these airplane tires, therefore, constituted a complete reduction to practice of Putnam's supposed invention.

After proving his point by the use of these airplane tires, Mulford immediately proceeded to secure tires which would give the same riding characteristics, but which would have, in addition, the kind of tread most suitable for use on motor cars. He succeeded in persuading the Braender Company to acquire, at considerable expense, mold equipment for building him such tires, and they did build them for him in 1919. These Braender tires, which I am convinced Mr. Mulford used at low pressure on his small cars in 1919, constitute an additional anticipation of the Putnam patent.

Mulford's realization of the desirability of having thin side walls in tires intended for use at low inflation pressures is evidenced by the fact that he originally ordered from the Braender Company tires of 6-ply construction (the same number of plies as in the airplane tires), and when, through an error, the Braender Company furnished him, instead, tires of 8-ply construction, he insisted upon obtaining, and did obtain, from the Braender Company, almost immediately, 6-ply tires to replace the 8-ply tires.

In connection with Mulford's first 8-ply Braender tires, he testified that they were noticeably harder riding than the airplane tires which they replaced. There is some conflict in the evidence as to whether such a difference in the side wall construction of two tires will be noticeable in the riding of the car. From my own experience I am convinced that the difference in flexibility between the airplane tires, to which Mulford had been accustomed, and the 8-ply Braender tires, which he received early in 1919, would have made a difference in the riding qualities of the car under certain circumstances, which would have been noticeable to Mulford.

As I have said, I hold that Mulford's use, beginning in 1917, of the airplane tires on his Mulford special sedan, and his use, beginning in 1919, of the Braender tires on that same car, and on his Opel roadster, each constitutes a prior reduction to practice of the alleged invention of the Putnam patent.

The plaintiff urges strenuously, in support of the Putnam patent, the almost universal use to-day of the "balloon" tire, which the plaintiff claims is the tire of the Putnam patent, and the great value of the "balloon" tire to the motor industry and to the public. In my opinion the plaintiff has not overestimated the value of the "balloon" tire. But I do not think it came from Putnam. He was one of those who thought of it, and one of those who told about it, but he was far from being the first. As I have said, the authors of the various prior articles and prior patents to which I have referred told fully as much about such tires as did Putnam. Mulford, in actually reducing to practice the ideas which Putnam disclosed in general terms in his application filed several years later, gave to the world everything that the plaintiff contends was given by Putnam.

Putnam was not the bell cow, who led the entire herd and all the different herds along the highway down to the "balloon" tire barn, with its luxurious beds, but was merely one of the many cows who had seen the "balloon" tire barn in the distance and had journeyed down that way, and were grazing around outside of the barn for quite a while before the tire and rim men in charge of the barn opened the door. When the door was opened, they all went in with a rush.

The tire industry and the automobile industry have their associations for standardizing tires, rims, and devices of that character. That such things should be standardized is for the convenience and for the advantage of the public, and is economically helpful to the world. But in an industry which is thus standardized, and in which the decision with regard to changes rests with a comparatively few people, changes are apt to take place suddenly, when those in control open the door to them. To my mind this accounts, in large measure, for the rapidity with which the "balloon" tire came into use in 1923 and 1924. The prior publications and patents to which I have referred, and the prior work of Mr. Mulford, evidence constant efforts by individuals, extending over a period of years, to bring about the use of larger, softer tires. It was not until those in control of such matters in the industry decided that such tires should be used that their general adoption became possible.

[2] In addition to holding the Putnam claims invalid for anticipation on the several grounds referred to above, I hold them invalid for the further reason that they are so indefinite as not to comply with section 4888, R. S. (35 USCA § 33; Comp. St. § 9432), that the patentee "shall particularly

point out and distinctly claim the part, improvement, or combination which he claims as his invention."

The requirement of the statute that the claims be definite is not a merely arbitrary requirement, but is based on sound reasoning. Claims must be definite, first, in order that the Patent Office and the courts may determine whether their subject-matter is new or old; and, second, in order that the business world, the men engaged in the particular art to which the claims relate, may be able to determine with reasonable certainty the metes and bounds of the patent monopoly, and thus be advised whether or not something that they are doing, or planning to do, constitutes an infringement. As the Supreme Court said in Merrill v. Yeomans, 94 U. S. 568, 573 (24 L. Ed. 235):

"The public should not be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights."

The first claim of the Putnam patent in suit reads as follows:

"1. A pneumatic tire of normally circular cross-section and designed to carry a predetermined normal load at a substantially reduced inflation pressure, modified from standard practice for the same load by a substantial increase in cross-sectional area and a substantial decrease in ratio of wall thickness to cross-sectional diameter."

If Putnam had told us his starting points, we could perhaps overlook the indefiniteness inherent in the expressions "substantially reduced inflation pressure," "substantial increase in cross-sectional area," and "substantial decrease in ratio of wall thickness to cross-sectional diameter." Putnam's patent does not give us a starting point from which any one of these three supposed changes can be gauged. All the patent tells us is that in each case we start from "standard practice," presumably as it existed on August 13, 1920. It does not tell us what that "standard practice" was.

I am convinced from the record in this case that in August, 1920, there was no such thing as "standard practice" with regard to tire widths or inflation pressures. It is true that the Tire & Rim Association recommended the maximum loads for different nominal sizes of tires and the corresponding inflation pressures to be used. But some car manufacturers undertired their cars, some put on the recommended sizes, and many car users followed the urgings of the tire manufacturers and put on tires of the size larger than those with which the car

was originally equipped. This last-mentioned practice of "oversizing" enabled the motorist to reduce the inflation pressure and thus obtain easier riding, without shortening the life of his tires.

Furthermore, this record shows that, though all of the tire manufacturers were making, in 1920, tires of the same "nominal" sizes, in both fabric and cord constructions, the actual sizes of these tires were a very different thing than the nominal sizes, and varied considerably as between different manufacturers and as between the cord and fabric constructions. Also the record shows that the inflation pressures recommended by the Tire & Rim Association were not, in fact, used by motorists, but that the inflation pressures actually employed varied over a wide range and, in general, averaged very much lower than the pressures recommended.

"Standard practice" in 1920 was an uncertain and indefinite thing. It was a different thing for one car than it was for another, different for a motorist who used "oversize" tires than for one who did not, and, as far as inflation pressures are concerned, different for nearly every motorist.

To uphold a patent such as this one, which specifies "substantial" changes as compared with "standard practice," where "standard practice" is not defined in the patent, and, in fact, was not a definite thing, would lead to no end of confusion, and no end of litigation. There is no person so skilled in this art that he can, by examining a given tire, and testing it with the tools of all of the laboratories in the world, determine whether or not that particular tire is an infringement. In addition to all of his skill, and all of his facilities for testing, he must know the history of the art. It is not sufficient that he be a man "skilled in the art." He must also be an historian.

In every case where infringement is charged, and with reference to every tire alleged, to infringe, testimony must be taken for the purpose of establishing, if indeed it can be established, what was the "standard practice" in 1920, with which that particular tire is to be compared.

In this case, as I have stated at the beginning of this opinion, the defendant was, at the time of the filing of the bill of complaint, selling more than 50 different sizes and constructions of so-called "balloon" tires. In advance of trial the defendant tendered all of those 50-odd tires into court and asked the plaintiff to select those which infringed the claims of the Putnam patent. The plaintiff was thus, at the outset, confronted with

a difficult problem. Plaintiff's counsel contended that it was not easy for them to state which of those tires infringed the patent and which did not. They did not want to do it. The court, however, directed them to do so. As a result they filed their bill of particulars, in which they said that they contended that all of those tires infringe Putnam's claims 1 and 2, but that for the purpose of the trial they "charged" as infringements only 2 out of the lot.

The plaintiff's own reluctance to specify which tires infringe the patent, and its apparent desire to confine the issues at the trial to but 2 tires out of the 50, emphasize the fatal indefiniteness of the patent.

Counsel have not been able to cite a single case; involving a patent like this one, where the changes which constitute the supposed invention are defined in the claims only as related to "standard practice," or some other "standard," concerning which the patent itself is silent. The case of General Electric Co. v. Nitro Tungsten Lamp Co. (C. C. A. 2) 266 F. 994, has been put forward by the plaintiff as such a case. An examination of that decision, and of the claim to which it relates, shows that it is not. That claim, while it describes the improved lamp by comparing it with another lamp, states definitely what that other lamp is. It defines its own standard of comparison. One skilled in the art could, therefore, determine the starting point by an examination of the claim itself, and then determine whether or not any given lamp departed from it, in the direction, and to the extent, specified in the claim. Here, on the other hand, neither the claim nor the specification gives any information whatever as to the starting point.

[3] In this connection the plaintiff urges that the file wrapper of the Putnam patent states, as part of the attorney's argument, the specification and claims meant by "standard practice," and thus remedies the lack of definiteness of the patent itself. With this contention I cannot agree. The contents of a file wrapper has no probative force whatever. The only uses that can be made of it are (1) to interpret the language of a patent, where that language might have two different, but perfectly proper, legitimate meanings; and (2) to estop the patentee from asserting for a claim a construction inconsistent with its history. Stumpf v. A. Schreiber Brewing Co. (C. C. A. 2) 252 F. 142. The file wrapper contents cannot be used for the purpose for which the plaintiff seeks to use it here.

Therefore I hold that, in addition to being invalid and void because anticipated by the Palmer and other prior publications, and by the Hawley and Perrot patents, and the Mulford prior uses of airplane and Braender tires, the Putnam claims 1 and 2, here sued upon, are invalid and void, because they are too indefinite and uncertain to constitute a compliance with the statute.

The bill of complaint is dismissed, with costs.