SWANN RESEARCH, Inc., et al. v. DOW CHEMICAL CO.

No. 535.

District Court, E. D. Michigan, N. D.
Oct. 18, 1935.

Dike, Calver & Gray, of Detroit, Mich. (George L. Wilkinson, of Chicago, Ill., James P. Hume, of Chicago, Ill., and Henry L. Jennings, of Birmingham, Ala., of counsel), for plaintiff.

Gilbert A. Currie, of Midland, Mich. (John F. Oberlin, of Cleveland, Ohio, Russell Wiles, of Chicago, Ill., and C. A. Campbell, of Midland, Mich., of counsel), for defendant.

TUTTLE, District Judge.

This case involves two patents: (1) The patent to Carothers, No. 1,875,317, application filed April 7, 1928, granted September 6, 1932; and (2) the patent to Carothers, No. 1,907,498, application filed November 11, 1930, granted May 9, 1933. Both of these patents are owned by Swann Research, Inc., one of the plaintiffs herein. The other plaintiff, Monsanto Chemical Company of Alabama, is the exclusive licensee under said patents.

The law is that people who make new and useful inventions are given a 17-year monopoly. The determination of the validity of a patent and its infringement is submitted to a court of equity; the chancellor using his best ability and judgment to do equity with reference to that right which the law intends to give to inventors. On the one hand, he must see that the inventor gets that which the statute gives him, and

on the other hand, he must interpret the patent in such a way that it will not be an obstacle to doing the things which were previously known or which could have been done without the genius of an inventor. That is what I ought to do with these patents. I should ascertain whether there is a new and useful process disclosed, and, if there is, I should protect the plaintiffs in their rights. But, if there is not a new and useful process, I should see that the patents do not act as an obstruction to ordinary progress and to the use of things which were known independently of the patents.

The patents in suit are both process patents, having to do with processes for manufacturing diphenyl out of benzene. Benzene has been well known for so long that the proofs do not show when, nor how, it was first produced. However, it was known at the time of the Civil War, and about that time it was discovered in the laboratory that by heating benzene up to somewhere about 700 to 800 degrees centigrade a chemical change took place, and the benzene became diphenyl. A molecule of benzene is composed of six atoms of carbon and six atoms of hydrogen, the carbons being arranged in a ring structure, and in the chemical change one atom of hydrogen leaves the benzene molecule, and then two molecules of benzene, so altered, unite and form a molecule of diphenyl, which is made up of twelve atoms of carbon and ten atoms of hydrogen. However, the benzene ring of six atoms of carbon persists in the new molecule, which therefore consists of two benzene rings. As soon as this reaction was discovered, it was also learned that, if the material were held long at the temperature which converts the benzene into diphenyl, a further reaction takes place, in which additional atoms of hydrogen leave the diphenyl molecule and a new molecule is formed, made up of more benzene rings. This process of forming larger molecules continues through to what are here called "high boilers," and until at length all the hydrogen is eliminated, and carbon is formed.

Naturally, these discoveries were made in a laboratory, and the experiments which demonstrated the facts were made in a laboratory. At intervals chemists wrote articles describing what they had done and what they had discovered. They learned that, in order to get the diphenyl before all the secondary reactions took place, it was necessary to cool the product and stop these further reactions. From the beginning there was discussion as to whether or not the reaction of forming what I have termed secondary, or subsequent, products went from the benzene molecule first to the diphenyl stage, and from that to the three benzene-ring stage, and so on, the molecules constantly increasing in benzene rings, losing hydrogen, until they became carbon; or, on the other hand, whether some of the material went directly to the three or four ring compound at the same time some of it went to diphenyl. Chemists are still arguing about that and still discussing it. That does not materially affect the patents, but it shows that, as in most chemical matters, there are still some things open to discussion.

The laboratory methods of making diphenyl were varied, but probably the most common consisted in passing the benzene vapor through a tube heated on the outside, cooling the vapor after it passed through the hot tube, and collecting the condensed product which consisted partly of diphenyl and partly of material in which further reactions had taken place, and which consisted of more than two benzene rings. Other methods were used, like putting an electric heating device directly over a body of benzene so that it both served to heat the benzene to boiling and to heat the vapor which passed immediately in contact with it to the conversion point.

The temperature at which the conversion from benzene to diphenyl takes place was apparently as well known from the beginning as it is now. However, the reaction takes place over a range of temperature, and with the passing of the years the twilight zone may have lessened a little and the range may now be better understood. It was also known that benzene boils at about 80 degrees centigrade, so the operation always started at that temperature, and, since it was necessary that the change take place at 700 degrees to 800 degrees centigrade, the change always occurred in the vapor stage and it was always necessary to cool the material in order to condense it and get the product. So the early experiments always included preheating and cooling.

Following its discovery, for a long time there seems to have been no use for diphenyl. The chemist's motive for making its discovery may be likened to that of the astronomer who discovers a new star and

describes it; at least I have heard of no use to which diphenyl was put nor of any market or demand for it for more than half a century after its discovery. It had no market price and was made only in small quantities for experimental purposes in laboratories.

Thus the matter ran along, at intervals chemists finding out something more about this diphenyl and publishing their findings. Nothing looking to its commercial use was done until 1927, when an employee of the Indian Refining Company conceived the idea of using it as a heat transmitter. He intended to use it in the boiler of a heater, as water is used, if he could get it cheaply enough. As a result of that idea (whether discovery or not) of the Indian Refining Company, the latter inquired of plaintiff, or its predecessor, with which company the patentee Carothers was connected, for a price on 31,000 pounds of diphenyl. The plaintiff at that time had no peculiar knowledge of diphenyl beyond what I have described as coming from the laboratory. The first purchase of diphenyl for money ever made, so far as the record discloses, occurred when the plaintiff, wishing to manufacture the 31,000 pounds desired by the Indian Refining Company, purchased a small quantity from the Eastman Kodak Company for experimental purposes at $40 a pound. That does not represent market price. It was the first and only sale prior to the sale by plaintiff. Plaintiff, through its laboratory and research departments, under the guidance of Mr. Carothers, then began investigating to find out—not whether they could make diphenyl, because it had been made and the pound had been purchased—but whether or not they could make it in quantity at a cost which would give them a profit, and at a price interesting to the Indian Refining Company.

Plaintiff's investigation lasted a few months. Then, within a few days, a structure was built and used for six weeks. Thereupon this application for patent was filed, and by mere coincidence the first plant was destroyed by fire on the same day. In the operation of plaintiff's first structure, benzene was boiled, and the vapors from the boiler rose and passed over electrical heaters placed along the path of the ascending vapors. The vapors were first heated with elements that were around 600 degrees temperature, and finally passed a very hot element at the converting temperature. The vapors were then cooled and condensed, and the product, which was diphenyl mixed with "high boilers," was recovered, such crude product being finally distilled to separate the diphenyl, in accordance with methods long used in the laboratories and in the chemical art generally.

The first patent and its claims, fairly construed, describe the process as one in which the vapors from the boiling benzene at 80 degrees centigrade are first brought up to a temperature below the converting point, next suddenly and rapidly brought in contact with a surface heated to the converting point, and then suddenly cooled before the diphenyl has time to pass on to the subsequent reactions. Some of the claims contain one of these features and some others, but the thing sought to be claimed as new was the preheating, the immediate contact with the surface at converting temperature, and the sudden cooling. The laboratory investigators, preceding the plaintiff, had talked about the carbon that collected. Their discussion seems to have been mainly with reference to the misfortune of having carbon collect on the heating unit, which transformed the vapor. But there is reference, also, to the undesirability of carbon in the product. What they were working for was to get diphenyl. That was the experiment. The principal part of the discussion in the previous articles about carbon had to do with the misfortune of having carbon get on the heating unit in the structure they built, making it unsatisfactory for diphenyl production, rather than the fact that they had carbon, tar, or high boilers in the product. It seems to me, after reading the prior art publications and considering Carothers' work, that he was rather intimidated by what had been said about the carbon so far as the use of a tube was concerned, and that, in order to avoid that misfortune, in building his first structure, he went to a structure other than the tube. Having, however, had some difficulty with his first structure, he built a second one which was an entirely different structure from the first one.

When the plaintiff built its second structure, which was within a few days after the destruction of the first, it built one mechanically and entirely different from the first—so different that one would hardly remind you of the other. In the operation of the second structure the ben-

zene was first boiled, and the vapors were then carried down in a tube through the center of a pot of melted lead, and discharged so as to bubble up through the lead, and be preheated. In this structure as first built, there were two of these lead pots, the first of which preheated the vapors, and the second of which heated the vapors to converting temperature. A third lead pot was presently added so that the vapors were preheated in two stages, the first heating the vapor to something like 400 degrees centigrade. I realize I am discussing temperatures that cannot be accurately ascertained except by guess, logic, and general principles. No one has been able to tell the exact temperatures of vapors within any of these heating units. There is uncertainty in the apparatus with which the temperature is taken, and uncertainty as to how much the pyrometer is influenced by the vapors whose temperature it is sought to measure, and how much by the heating units around the vapor. This is a matter about which we cannot be accurate. In general, however, the plaintiff passed the benzene vapors into the first pot of molten lead, let them bubble up through the lead, and thence carried them over to a more highly heated cauldron of lead into the bottom of which the vapors were conducted and again allowed to bubble up through the lead. The vapors were then put into the final heater which brought the vapor up to the conversion temperature and thereafter the gases were carried off, collected, condensed, and distilled.

For a long time no one except the plaintiff made any diphenyl. It has made about two and a half million pounds. Other uses than heat transfer have been found for it. Then defendant studied the subject of diphenyl and in 1931 installed a plant which again is mechanically of an entirely different form from either of the two built by plaintiff and already described. Defendant attacked the problem by employing tubes, using first iron tubes and finally adopting carbon tubes. In defendant's commercial structure, the vapors produced by boiling benzene are carried up through a large-sized pipe, at the upper and closed end of which they pass around and between forty-nine carbon tubes heated by electricity, which electricity flows through them from end to end. These tubes are heated to a conversion temperature, and, after the benzene vapors pass up around and between them, the vapors turn and go down inside the forty-nine carbon tubes

heated at this converting temperature. Connected with the bottom of these carbon tubes are corresponding iron tubes by which the vapors are carried back through the large pipe. The part of the structure below the carbon tubes is really a heat exchanger. That part of it that carries the gas up is a preheater. Vapors which start at 80 degrees centigrade on their way up to the 800 degree centigrade carbon tubes are in contact with the outside of the forty-nine iron tubes, within which are the hot vapors coming out of the carbon tubes. As a result, the vapors on their way up are cooling the vapors and product that are on their way out of the carbon tubes, and conversely the vapors on the way up are being heated by the vapors and product on their way out. These vapors so cooled pass on and out to a condenser, and the condensed crude diphenyl is separated to give pure diphenyl, the same as it was in the laboratory, the same as it is in the plaintiff's commercial process and all other processes for making diphenyl.

The second Carothers patent addresses itself to a process using tubes of any kind, and, speaking broadly and I think fairly, it claims, and all it claims is, that the vapors are put through the tube uniformly, rapidly, and at turbulent flow, which the patent describes as being above the "critical velocity." When we consider rapidity and turbulence, we find that the patent really means only rapidly and uniformly, because the flow could not be rapid, as I understand the record in this case, without being turbulent. So the claimed novelty of the second patent is in making the vapors go rapidly and uniformly through a heated tube.

■ When dealing with a process patent, the chancellor should keep in mind that he is not to sustain a patent for things which the Lord made, for properties that are possessed, but only for the things that man does with those properties, and the way man uses those properties. It would be wrong to hold patents valid and follow that with such findings of infringement as would take away from the world the natural and ordinary uses which the Creator intended those things to have.

■ I should not interpret these patents as if the world had been unsuccessfully waiting and trying to get this result, through mechanical skill, and then finally the thing desired was obtained through these patents. This is not that sort of a process. There

was no public demand for diphenyl. The public was fully and promptly supplied in every demand it made, and, when there was a large demand for more than a laboratory supply of diphenyl, the opportunity to sell was offered to one company. The need was not published. I do not criticize the Indian Refining Company for failing to get competitive bids, but their action plainly indicates that they had no doubt that diphenyl could be made in large quantities, and that the only question was price. There seems to have been a reason why the Indian Refining Company approached the plaintiff. There was a friendly relation, and we like to deal with our friends. They did not hunt to see if any one had the genius to manufacture diphenyl in large quantities at a low price. They seemed satisfied, without getting competitive bids, that they should go to a fine concern in whom they had confidence, and get a price. It would be a misunderstanding of the situation, as it existed in 1927, if anyone concluded that the world was waiting for diphenyl and the chemical engineer could not furnish it. That is not the picture at all.

If there was any discovery, any revolution, it occurred in the Indian Refining Company, when they conceived the idea that this material, which had long been made, had a useful purpose and was not merely a thing for the chemist's den. It seems there was not any unusual difficulty about making diphenyl in quantity, although it took some time and some figuring. If a third concern to-day were to start diphenyl manufacture, I should expect it to spend about as much time as the plaintiff did, perhaps as much as the longer time defendant took, in getting ready to hook up an apparatus and start. Considerable figuring would be required unless one were to copy exactly a prior device. Of course, if the plaintiff's structure were exactly copied, the copy would work as plaintiff's does. If defendant's structure were copied, the copy would work in the same way. But, if one wanted to make a different structure from either, using perhaps a different kind of heat, and different methods of economizing heat and benzene, the problem would require some figuring, some work, cutting, contriving, and trying.

There was never any demand for diphenyl that was not fully and promptly met, no difficulty greater than would be encountered in beginning the manufacture of almost any kind of chemical. Diphenyl has never been commercially made except by plaintiff and defendant. Other concerns have not tried to make it. When they do, if they do not copy a prior apparatus, they will work out something entirely different. The only three commercial structures ever made are entirely different from each other, and work on different mechanical principles, although they employ the things that I have mentioned as being in these patents as the claimed processes.

Of course, it is possible to go through these patents and analyze them, and theorize on them, and work out an interpretation by which defendant does not infringe. But these patents, if they have any value at all, are broad and basic. They were intended to be broad and their language describes basic things. The things described in these two patents are so basic and broad and far-reaching and fundamental that during the life of these patents no one is ever going to be able to make any diphenyl on a large scale without infringing the language thereof, if interpreted as they were intended to be. Diphenyl cannot be made on a large commercial scale without speed or without turbulence, or without passing the critical point, or without preheating. It cannot be made in any economical way without heating the vapors in advance and cooling them off afterwards. I recognize the fact that some judges and lawyers would analyze these patents differently, and I can do it. I could go through them and work out a theory of noninfringement, but to do that the patents would have to be narrowed, and, when dealing with a process patent relating to chemistry wherein things are so uncertain and unsettled, I do not think these patents should be approached in that way. I hold that, interpreted in the way they are intended to be drawn and the claims made, the defendant infringes both patents.

Both patents look to me as if the applications therefor were drafted after a machine for manufacturing diphenyl had been built and then, after looking through the prior art, defining the fundamental things which the machine did. The patents are not definite. They do not state how fast the vapors shall move; they do not state how long they shall be heated. In fact, they do not tell very much about temperature. Process patents should be definite. Should a man want to build an apparatus for making diphenyl, the information is still unavailable unless he copies an ap-

paratus already made. The temperature measurements, speeds and theories of these patents, as I see it, were worked out from a machine after it was made, and someone figured out that the flow in the pipes was turbulent and rapid. Who knows what "rapid" means? This is like the balloon tire case, decided by this court some years ago. Steel Wheel Corporation v. B. F. Goodrich Rubber Co., 27 F.(2d) 427. The tires were large, but I never could find out where I passed from an over-sized small tire to a small-sized balloon tire. I could not classify them when I was through. Speed is subject to the same objection—it means fast. By reading the patent, an engineer could not build a structure with heat enough to convert and yet cool the vapor quickly enough to avoid the formation of high boilers, tar, and carbon without experimenting.

The patents do not give the information from which an apparatus can be built. The process is not of that kind. If the patents disclose anything not previously described in the prior art, it is something that nature made and was used in the prior art without mention. The story as to details of temperature, and all that, was all told in the prior art. After the apparatus was built and a lot of diphenyl made, the patentee claims speed and turbulence, but no one building one of these machines would first figure out what turbulent flow he was going to use and try to regulate that speed. When the machine was built and operated, it was observed that the speed was such that the vapors were turbulent. But turbulence was not considered in building the machine. I do not believe Carothers used turbulence as his measure in regulating speed, nor did defendant in building its machine ever think of turbulence. Had Indian Refining Company gone to any big chemical manufacturer and interested it in making a quantity of diphenyl, and the manufacturer started to build a machine, it probably would not have built one like plaintiff's, nor like defendant's, but I am convinced that it would have made a commercial device for making diphenyl, and I am also convinced that, when it was finished, the vapors would have been preheated, they would have moved at high velocity, and at a velocity beyond the critical point, and that they would have moved uniformly. The prior art shows plenty of instances where the vapors move pretty uniformly. The only point in the art criticized from the standpoint of uniformity is that in some cases the vapors may boil irregularly. These patents are broad and fundamental and go right down to the elementary things that must be done, the things without which no one will ever be able to make diphenyl in large quantities at a reasonable price. That is plain.

I think the true test of invention is whether the chemical engineer, knowing what had been done in the laboratory, could have gone out and built a successful plant, not necessarily like either plaintiff's plant or defendant's, but one involving these claimed elements. A third chemical manufacturer who takes the old laboratory data and undertakes to build a diphenyl-making plant probably will build one different from any of the three prior plants, but he will have in it that which these patents claim. Diphenyl cannot be made in quantity without speed, which will produce turbulence. The manufacturer, however, will not think of that. That will never enter his mind or bother him. He will not figure out what conditions will produce turbulence for the vapor he is going to use. Time, heat, and volume are interrelated, and it is the engineer's problem to use heat, volume, and speed to get his product.

I recognize, of course, that I should not look at this in the light of to-day, after the results have been accomplished, but should put myself in the light of the time when Carothers worked. I am doing that. The problem came to Carothers first, and to no one else. The first men confronted with the problem did the trick. The Indian Refining Company created the demand, and the first place to which they went solved the problem with surprising promptness. That does not look like a waiting world. It shows that what the chemist knew in the laboratory only needed to be used by the engineer to put it on a big scale. The fact that the laboratory workers were bothered with carbon when putting vapors through a gun barrel and when dropping vapors through a tube should not bother me in interpreting these patents. The commercial manufacturers can afford to build a plant and experiment with it and work it out. The talk of speed is not important; "speed" means "time," of course, and the longer benzene is kept at a converting temperature the greater the per cent. that will be converted into something. I am inclined to agree with the plaintiff that the longer the benzene vapors stay at the converting temperature the larger is the percentage of

benzene converted, and the more conversion there is of benzene the greater the percentage of high boilers, tar, and carbon contained in the product. It is the engineer's problem to figure out whether it is desirable to hold the vapors for some time at a high temperature and waste benzene but get more diphenyl in one passage or whether it is more desirable to put the benzene through more frequently, for shorter periods, thus saving benzene waste but increasing fuel cost.

One can take the prior art devices and from a chemist's analysis see that, if the time is shortened, there will be less of the objectionable products. But they were slow processes and adapted to making only a small amount of diphenyl. When the first engineer tackled the problem of making diphenyl on a large commercial scale, he promptly accomplished his purpose. There is nothing to indicate that it was a difficult problem. I think plaintiff treats the art as too small. We should not think of this as an art particularly and solely relating to the diphenyl molecule. It is the chemical art, and Carothers is charged with the things known to the chemical art. I feel sure that, when they knew how to make diphenyl and knew that benzene must be heated up to a certain point to make the conversion to diphenyl, and that the conversion would go too far if it remained long at the temperature, they were dealing with the chemical art in which it was well known that such vapors must be heated as uniformly as possible to the conversion temperature and must be cooled rapidly to stop the reaction.

I hold the patents lacking in invention and void. The decree will be for the defendant dismissing the bill.