**TWEMO CORPORATION et al. v. GOODYEAR TIRE & RUBBER CO. et al.**

No. 7470.

Circuit Court of Appeals, Sixth Circuit.

Nov. 14, 1938.

E. Clarkson Seward, of New York City (E. Clarkson Seward and W. Saxton Seward, both of New York City, and Day & Day, of Cleveland, Ohio, on the brief), for appellants.

Albert L. Ely, of Akron, Ohio (Albert L. Ely, of Akron, Ohio, Luther E. Morrison, of New York City, and R. H. Waters, of Akron, Ohio, on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The three Fairchild patents in suit are all in the automobile tire art and relate specifically to machines for vulcanizing inner tubes by what is called the full molding process.

The plaintiffs are the inventor, Walter L. Fairchild, and his exclusive licensee. The defendant, Goodyear Tire & Rubber Company, is a user of the alleged infringing apparatus, and the defendant, National Rubber Machinery Company, is its manufacturer. The patents are reissue No. 16,-542, granted February 8, 1927, original filed December 10, 1921, No. 1,773,810, granted August 26, 1930, and No. 1,680,777, granted August 14, 1928. Of these the reissue is said to be basic and to have had a revolutionary effect upon the art, the others to disclose specific improvements in construc-

tion valuable to the industry. Of the claims in suit, 22 and 24 of the reissue patent were held valid but not infringed, 30 to 33 inclusive of the reissue invalid in view of prior art, 1, of patent 1,773,910, valid but not infringed, and 4 invalid in view of prior art, and claim 1 of patent No. 1,680,777 valid but not infringed. The bill of complaint was therefore dismissed as to each.

For many years automobile tires had been vulcanized in annular form, United States Rubber Co. v. Firestone Tire & Rubber Co., 6 Cir., 79 F.2d 948, while their inner tubes continued to be vulcanized upon straight or curved mandrels. In the earlier process the rubber material for the tubes was wound upon a straight metal pole, there confined with spirally wrapped muslin, and subjected to heat for vulcanization. The ends of the tubes were then brought together in telescoping position, united with rubber cement, and vulcanized by a separate operation. In the process of translating a vulcanized tube from straight to circular form there was some buckling of the inner circumference and stretching of the outer circumference because of the difference in their lengths. So long as high pressure tires with their small cross-sectional diameters remained in use this buckling was not a serious manufacturing problem, for the buckling disappeared on inflation and many millions of tires so made performed satisfactorily. With the advent, however, of the low pressure or balloon tire, which came into general use about 1923 or 1924, Steel Wheel Corporation v. B. F. Goodrich Rubber Co., D. C., 27 F.2d 427, the buckling of the tube upon transformation to circular form became much more serious because of the greatly increased cross-sectional diameter of the new type of tire. The industry then turned to vulcanizing the tubes upon a curved but not endless mandrel. This avoided buckling but the ends still had to be telescoped, cemented and vulcanized, and the process was slow and expensive.

It cannot be denied that the general adoption by the tire industry of the full molding process for vulcanizing inner tubes followed in point of time the granting of the Fairchild reissue patent. Whether it was brought about by recognition of virtues in the Fairchild disclosure or forced upon the industry by the advent of and the popular demand for the balloon tire is a subject of controversy. It is also true that full molded tubes were first produced by

the Carlisle Rubber Company, an earlier licensee of Fairchild, upon machines made for it in the plant of DeMattia Bros., of Passaic, N. J. Whether these machines responded to the teachings of the reissue patent, or as contended by the defendants, were completely reorganized by practical machine manufacturers upon ideas of their own, it is impossible upon this record to say. In any event the vulcanizers made by DeMattia were put into production in the spring of 1927, and during the succeeding five years some 7,000,000 tubes were made and distributed by the Carlisle Company. Thereafter the machines were abandoned.

It must not be supposed from this recital that the art leaped abruptly from the curved mandrel to the vulcanizing mold upon Fairchild's disclosure. It was to be expected that in an industry which had long been vulcanizing tire casings in annular form consideration should be given to the possibility of similarly molding tubes. In the British patent No. 10,250 of Wicks, and in the American patent to Doughty, No. 617,414, there were disclosed as early as 1899, molds for vulcanizing pneumatic tubes. The concept undoubtedly evolved from the old practice of curing single tube bicycle tires in heated molds while the tires were expanded by internal fluid pressure, and Doughty, we learned in the Firestone Case, had been connected with the Dunlop Company in the manufacture of bicycle tires. Miller, in his patent No. 1,234,065, of July 17, 1917, shows a steam jacket mold for curing tires which he says is adapted to vulcanizing inner tubes, and jacketed molds are also disclosed in patents to Mc-Lean, No. 1,362,717, 1920, and to Atcheson, No. 1,388,138, 1921.

It has been necessary to scan the history of the art in order to evaluate Fairchild's contribution to it in view of the insistence that he was a pioneer in full molding apparatus, and the too eager acceptance of the master's generalization, "The patent is one for a machine of a character which has revolutionized the tire tube industry" as tribute to the generic character of his specific invention. Fairchild was not the first to disclose apparatus for the full molding of inner tubes. This is not to say that he did not contribute something of value to the art or that his contribution was wanting in the quality of invention. It becomes necessary, however, to understand precisely what that contribution was, not only to ascertain the validity of his claims but also to mark the limits of his monopoly if any are valid.

Fairchild devised a mold consisting of two members united by a hinge pivot so as to open and close somewhat like a watch. The mold members were provided with hollow chambers connected to a source of steam supply by flexible hose so as to be maintained continuously at vulcanizing temperature whether open or closed. To avoid the wilting of the tube, which being of pure rubber is quickly brought to a plastic condition by heat, the lower mold member was made larger in cross-section than the upper so as to receive more than half of the tube and furnish a better support for it. The hinge was of the type in which the pivot rides in a vertically elongated slot. This was to permit the mold to be closed and opened by a swinging motion for most of the distance but by an axial movement for a slight distance immediately before closing and upon opening. To secure this axial movement the hinge pivot was held at the top of the slot by a supporting toggle rod. In operation, after the formed and lightly inflated tube is placed in the lower mold member, the upper mold member is swung down upon the pivot until it is almost closed. Then, while the two members are in parallel relation to each other, the closing movement is completed by the movement of the supporting rod to permit the hinge pivot to drop downwardly in its slot, while the axial movement is guided by tapered dowel pins projecting upwardly from the lower mold member and fitted to enter complementary recesses in the upper mold member. The axial movement is slight, and intended to bring about a perfect register and even contact between the engaging surfaces of the two sections which define the mold cavity in which the tube is vulcanized.

After the mold is closed and during vulcanization, the tube is highly inflated. This tends to force it between the meeting edges of the mold members, and to create upon its outer circumference an objectionable ridge or rind, which weakens the tube. To avoid excessive rind the mold members are clamped together tightly by four bolts swiveled to the lower member and adapted to be swung into slotted lugs on the upper member and screwed tight by hand wheels. The mold as a whole is so mounted on its frame that it can be moved into a slightly angular position during the vulcanizing operation. This is to permit

the water formed by condensation of the heating steam to be drained. To facilitate this movement and to hold the mold in operative position, its members are counterbalanced by weights. Finally, the apparatus includes pipes for supplying air or vulcanizing gas to the tube to inflate it during vulcanization, and the mold members are provided with an opening to permit the barrel of the tube stem to project inwardly in a radial direction as it does through the rim of an automobile wheel. The basic concepts of the Fairchild invention are said to reside in claims 22 and 24 of the reissue patent, which are directed to the opening and closing of the mold, and in claims 30 to 33, which are directed to the unequally divided mold. In evidence and argument claim 22 was stressed as pivotal. It reads: "In a device of the class described, a frame, cooperating mold elements pivotally mounted therein, and having recessed spaces adapted to form a vulcanizing chamber when said elements are in engaged relation, means to move one of the said mold elements as a whole with respect to the other while maintained in parallel relation, and to swing them apart into inclined relation thereafter, steam chests enclosing the surfaces of said mold elements to heat said chamber, and means to supply steam to said chests while said elements are in engaged or separated relation."

■ As already indicated, pivoted molds for vulcanizing tubes had been disclosed in the art. Steam jacketed molds were also old. There could be no invention in supplying steam by flexible hose to mold members when they were disengaged as distinguished from supplying them when engaged. The novelty that resides in the claim must if anywhere be in the "means to move one of the said mold elements as a whole with respect to the other while maintained in parallel relation and to swing them apart into inclined relation thereafter." While such means may be found in the arts in non-analogous environments, we are not persuaded of the absence of invention in the present combination. The inventor's purpose in providing this two-way movement of the mold members was to provide for the release of articles from the mold after the completion of the vulcanizing process by a method of withdrawal that would reduce the "expensive percentage of loss due to tearing of the vulcanized product." The court below held claim 22 valid, and we agree.

■ Upon the question of infringement the essential point in controversy is whether there is in the defendant's apparatus the two-way movement of the mold members, or as expressed in the claim, whether it includes "means to move one of the mold elements as a whole with respect to the other while maintained in parallel relation." It is a recognized principle of the patent law, not here challenged, that the omission of any element in a patented combination avoids infringement. Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U.S. 399, 410, 25 S.Ct. 697, 49 L. Ed. 1100; Union Paper Bag Machine Co. v. Advance Bag Co., 6 Cir., 194 F. 126, 138; Jones v. General Fireproofing Co., 6 Cir., 254 F. 97, 101; Hall-Mammoth Incubator Co. v. Teabout, 2 Cir., 215 F. 109, 110; Dillon Pulley Co. v. McEachran, 6 Cir., 69 F. 2d 144, 147.

The defendants' vulcanizer is supported upon a pedestal, the upper surface of which is inclined downwardly to hold the bed, which supports the lower mold section. It follows closely the Brundage Reissue Patent No. 18,808, granted April 25, 1933, on application filed March 14, 1928, and assigned to National Rubber Machinery Company. Instead of being supported directly on the bed, the lower mold of this apparatus is supported upon a flat ring-shaped inflatable diaphragm. The upper mold section is bolted to a swinging arm pivoted at the side of the machine upon a slotted bearing. The free end of this arm is connected to the operating piston of a cylinder. When the upper half of the mold is raised by the action of the piston, and the tube to be vulcanized is placed in the lower mold section, the operation of the piston and the combined weight of the arm and upper mold causes the arm to descend in an arc about the pivot until the mold faces are engaged. The fall may be decelerated to avoid too sudden impact by restricting the flow of air from the cylinder, just as a door is checked in closing movement by a pneumatic door-check. There is, however, nothing to stop the descent of the upper member, which weighs between six and seven hundred pounds, until it makes contact with the lower member. Centrally of the base is located a rotating clamp having cam locking surfaces engaging corresponding locking surfaces

on the swinging arm, by means of which the mold sections are locked together after engagement. To counteract the fluid pressure within the inflated tube to be vulcanized, which tends to spread the mold and to cause formation of excessive rind, the inflated diaphragm is provided. The inflation of this diaphragm, concurrently with tube inflation, opposes the inner tube pressure, which would spread the molds, and is also designed to take up any spring or irregularity in the apparatus. The meeting faces of the mold members are beveled to insure perfect engagement, and this imparts to the lower member a somewhat conical configuration.

Much time and ingenuity were expended below in effort to demonstrate that the defendants' machine provides means for the axial movement of the two mold faces toward each other while in parallelism, which are equivalent to those described and claimed in the patent. The master was in the beginning persuaded by the evidence, but upon more careful consideration after rehearing became convinced that no such means are provided, and that the two-way movement described in the patent is the essence of the inventive concept. The locking of the central clamp and the inflation of the supporting diaphragm are, it was contended, means equivalent to those of the claim for bringing the mold faces axially together while in parallelism. The single annular conical register of the lower mold, with its mating hollow cone of the upper mold, were urged as the equivalent of the tapered dowel pins of the patent, and the slotted bearing of the swinging arm as the equivalent of the loose hinge and toggle mechanism of Fairchild.

We find it unnecessary to enter upon a detailed discussion of the evidence which in the first instance gave seeming support to the contention that there is axial movement between the mold faces of the defendants' apparatus. In determining equivalency purpose and function are more persuasive than dimensions, especially when one has so precisely limited his claim to avoid prior art. United States Rubber Co. v. Firestone Tire & Rubber Co., supra, page 955. The sliding bearing and toggle arrangement, together with the tapered dowel pins of Fairchild, are clearly designed to secure an axial movement of the mold faces before their engagement. The central clamp and diaphragm of the alleged infringing device are locking mechanisms, which after engagement resist the spreading of the mold sections and eliminate distortion due to spring or other cause. The purpose, function and operation of the described means in the one apparatus are not those of the other. Were there any doubt about this, reference to the Fairchild specification would dispel it, since by familiar rules the claims must be read in the light of the description. Fairchild says in his patent, "The upper half will then have its face parallel to the face of the lower mold but at a slight distance from it. The toggle is then broken, slowly, thus bringing the upper half down until the faces engage, whereupon the two halves are locked together."

Fairchild thus clearly distinguishes the axial movement of the mold faces while in parallelism from any movement, axial or otherwise, that may take place under the force of the locking mechanism. While this movement is described as slight, and no doubt is, relative to the swinging movement, it is nevertheless distinct, and must necessarily be substantial enough to achieve the inventor's proclaimed objective. There is no such movement in the defended apparatus prior to engagement of its mold faces and none has been demonstrated. It may be that in an apparatus imperfectly machined, sprung or distorted by wear, the upper mold section in some arc of its circumference nearest the cylinder engages the beveled surface of the lower section before opposite arcs engage. When this occurs, however, there is merely a shifting of the pivoting from the pivot in the slotted bearing to the point of contact and a continuation of the swinging movement upon the new pivot, and it is to allow for this shift that the free hinge is provided. This is not only in the response to the expected operation of mechanical laws but was graphically demonstrated not only to the master but also by physical exhibit to us. We conclude that claim 22 is not infringed.

Claim 24 of the reissue is printed in the margin.[1] While it will be observed that this claim includes the two-way movement

[1] A device of the class described, adapted for the vulcanization of hollow articles, comprising a plurality of co-operating mold members, one of the said members being movable in two directions with respect to another, means to heat said members, and means to supply and exhaust air and vulcanizing gas separately

of the mold sections with respect to each other hereinbefore described, it adds an element not found in claim 22, to wit: "Means to supply and exhaust air and vulcanizing gas separately to and from the article being vulcanized in said mold members." The validity of the claim was attacked on the ground that it discloses an aggregation rather than a true combination. The master rejected the contention, as do we. No purpose will be served by adding at this time to what has recently been said on the subject. Detroit Stoker Co. v. Brownell, 6 Cir., 89 F.2d 422. While we agree that there can be no invention in conducting gas or air or both from a source of supply to fill the tubes and to provide means for their exhaustion, yet the Fairchild device as an operative whole perhaps required ingenuity amounting to invention. At least we are unable to say in the face of the presumption of validity attaching to the grant, and concurrent findings of master and court, that invention was clearly absent. We are content to agree with the decision below that claim 24 as limited by patent office proceedings is valid.

It is not, however, infringed. The defendants' vulcanizer has but a single line leading to the tube to supply air under pressure. It has no mechanism for supplying air and vulcanizing gas separately to and from the article being vulcanized. That such mechanism might be provided is beside the point, for just as earlier machines may not be substantially reorganized to establish anticipation, so may alleged infringing apparatus not be revised in material respects to make out a case of infringement. The distinguishing feature of claim 24 is not one that is immaterial so as to be disregarded. The history of the claim demonstrates that the element was included within it to avoid its rejection over prior art, and the specification discloses that the inventor conceived it to be vital to his patented combination.

Claims 30 to 33 inclusive are directed to the unequally divided mold, the lower section projecting above the center line of the mold on its inner circumference. As already indicated, the tube before vulcanization becomes plastic under heat and tends to wilt or overlap the edge of the mold so as to be pinched and thus weakened or destroyed when the mold is closed. The object of the inventor in designing his lower mold section with a recess of greater area than the upper was to secure a better seating of the tube and greater support for its side walls. There are, of course, other elements in this group of claims, but none that clearly gives it novelty over prior art, and the examiner so held. Upon experiencing difficulty in the proper seating of a tube in the lower section of an annular and equally divided mold, it would seem to be an obvious expedient to increase the area of that section. But obvious or not, unequal division of the area of the mold sections is clearly taught by the art. Blodgett Patent No. 708,953, 1902, not only shows an unequally divided mold but describes the need for and the objects to be attained by unequal division. The Goodrich prior use in Akron in vulcanizing rubber tubes upon which tires are cured as described in the Firestone Case, is clearly an anticipation, and it is idle to urge want of analogy between the curing of an inflated tube designed to hold a tire casing in predetermined shape during vulcanization and the curing of lighter tubes for the shape preserving and cushioning of the finished tire when in use. Without taking the time to consider other asserted anticipations, we hold with the court below that claims 30 to 33 are invalid because anticipated.

Fairchild's patent No. 1,773,810, of which claims 1 and 4, printed in the margin,[2] are in suit, is directed to an improvement upon the reissue patent to provide better means for handling the valve block. It must be understood that in molds which

---

to and from the article being vulcanized in said mold members.

[2] 1. Apparatus of the character described, comprising a plurality of mold sections adapted when placed in mating relation to form an annular vulcanizing chamber fitted to receive a tube to be vulcanized, a tapered recess formed in the inner edge of one of said sections fashioned to receive a valve stem of said tube, a tapered locking block adapted to fit into said recess for locking the valve stem

therein, and means for moving said block in a direction substantially parallel to the axis of the mold sections for bringing it into and out of said recess to lock and release the valve stem.

4. Apparatus of the character described comprising, a plurality of mold sections adapted when placed in mating relation to form an annular vulcanizing chamber fitted to receive a tube to be vulcanized, a recess formed in the mating edge of one of said sections fashioned to

are unequally divided the valve stem opening is necessarily located below the upper inner edge of the mold. It is therefore desirable to cut a notch leading to the passage for the valve stem, and this notch must be filled. In the reissue patent the notch was filled by a block carried by a swinging arm. In the present patent the valve block is shown as carried upon a sliding arm in a direction substantially parallel to the axis of the mold section. This form of mechanism is covered by claim 1. The master found it ingenious, and denoting invention, and so held the claim valid. Again deferring to the presumption of validity and concurrent findings of master and court, we are not prepared to say that the device was unpatentable. It is clear, however, that defendant makes no use of it. We affirm the decision below that claim 1 is not infringed.

Claim 4 is directed to a tapered locking block fashioned to receive the valve stem and adapted to fit into the recess of the mold section for locking the valve therein. The locking block of the earlier Fairchild reissue patent was not tapered. The tapering of a block to fit into a recess is an obvious expedient in the arts—as obvious, perhaps, as is the tapered bung of the wine barrel. This was the first reaction to the contention of its novelty in the Patent Office. It might well have been the final judgment there. With this view we see no purpose to be served by discussing alleged anticipation by Flynn patent, No. 1,571,193, or the alleged Diamond Rubber Company prior use. Claim 4 is invalid as failing to denote invention.

Of Fairchild patent No. 1,680,777, claim 1 alone is in issue. It is directed to "a locking block adapted to fit into said recess for locking the valve stem in the cavity, and means for insuring the proper seating of the valve stem in said cavity." Its purpose, as asserted by the inventor, was to act as a safety device to insure that the valve stem would always be properly positioned before the mold sections were closed. The master found its functions important, and regarded the claim as valid. His finding was sustained below, is not here challenged, and we see no reason to doubt its soundness. The defendants do not use the locking device of the patent and so do not infringe. They have a valve holding pin which engages the valve stem and prevents it from retreating into the wall of the tube but has no other purpose or function. It is not the equivalent of the locking block of the patent, the function of which is to prevent initial faulty placement of the stem.

The decree below is affirmed.

---

receive a valve stem of said tube and being tapered in a plane substantially parallel to the axis of the mold sections, a tapered locking block fashioned to receive said valve stem and adapted to fit into said recess for locking the valve therein, said block being carried by the mold section other than the one in which the recess is formed and being adapted to be brought into and out of locking engagement with said valve stem within said recess by the normal relative motion of the sections in moving into and out of mating relation.