## R. K. LE BLOND MACH. TOOL CO. v. WICKES BROS.

### No. 590.

District Court, E. D. Michigan, N. D.
Dec. 15, 1937.

Allen & Allen, of Cincinnati, Ohio (Marston Allen and Gibson Yungblut, both of Cincinnati, Ohio, of counsel), for plaintiff.

Bodman, Longley, Bogle, Middleton & Farley, of Detroit, Mich. (I. Joseph Farley and Maurice W. Green, both of Detroit, Mich., of counsel), for defendant.

TUTTLE, District Judge.

This is a suit for patent infringement brought by the R. K. Le Blond Machine Tool Company as plaintiff against Wickes Brothers as defendant, alleging infringement of certain patents. The suit deals with a more or less special type of lathe for machining the crankshafts of an automobile engine, and specifically turning what are known as the line bearings of such a crankshaft.

The suit is based upon three patents, one a reissue patent, No. 20,090, reissued September 1, 1936, upon an application filed July 2, 1936. This patent will for simplicity be referred to as the first patent. The original patent, of which this first patent is a reissue, was patent No. 1,843,359, granted February 2, 1932, upon an application filed December 15, 1928.

The second patent involved in the suit is reissue patent No. 19,905, which was reissued March 31, 1936, upon an application for reissue filed October 17, 1934. The original patent, upon which this reissue is based, was patent No. 1,934,976, granted November 14, 1933, upon an application filed July 2, 1930.

The third patent in suit is original patent No. 2,030,020, granted February 4, 1936, upon an application filed January 21, 1935.

The first patent was granted upon an application filed by William F. Groene as sole inventor, the second patent was granted upon an application filed by the said William F. Groene and George W. Luning as joint inventors, while the third patent was filed by the said William F. Groene and Walter R. Meyer as joint inventors.

All three of the patents were assigned to the Le Blond Company, the plaintiff here, prior to the filing of the original applications. The Le Blond Company, through its attorneys, conducted the proceedings in the Patent Office from the date of the original filing of each of the applications and also the proceedings connected with the reissue of the first and second patents; the originals of these patents, as well as the reissues, were therefore issued to the Le Blond Company as assignee of the respective inventors.

Patent No. 1,843,359, the original of the first patent, contained 20 claims as issued, while the reissue No. 20,090 contained the same 20 claims as the original patent, and in addition thereto, 5 new claims numbered 21 to 25 inclusive. Two of the original claims, 18 and 19 of this patent, and the 5 reissue claims, namely, claims 21 to 25, inclusive, were, at the outset of the case, charged by the plaintiff to be infringed by the defendant's construction. After all the proofs were in, original claim 13 of this patent was added to the case.

The second patent, reissue No. 19,905, contains 49 claims, of which claims 1 to 27, inclusive, were in the original patent No. 1,934,976, granted November 14, 1933, and the remaining claims 28 to 49 are claims added by the reissue. At the outset of the case original claim 19 and reissue claims 31 and 32 were relied upon. The 27 original

claims of this patent were drawn in terms of machines, while the 2 reissue claims, 31 and 32, relied upon, were drawn in terms of a method.

Claims 1, 2, 4, 5, 6, 19, and 25 to 28 of the third patent No. 2,030,020 were stated at the outset of the case to be the claims that would be relied upon.

Both the first and second patents, together with their respective originals, disclose a complete lathe with chucks and tools for turning the line bearings of an automobile crankshaft, while the third patent discloses merely a plurality of different modifications in the construction of a chuck adapted to be used in a crankshaft lathe of the character involved.

The machines disclosed in the first and second patents are the type known in the machine tool art as center drive lathes to distinguish these lathes from the ordinary lathe. In the ordinary lathe the work is driven from what is known as the head stock which carries a main driving shaft of the lathe to which power is applied from any suitable source to rotate such shaft. According to the characteristics of the work it is either supported between a pair of centers, one carried by a head stock and the other by what is known as the tail stock, or clamped in a chuck carried by the head stock. When the work is supported between centers a face plate is ordinarily secured upon the main driving shaft of the head stock and rotation of the face plate is communicated to the work, usually by means of what is known as a dog secured to, and supported upon, the work and suitably engaged with the face plate, although in some instances various types of chucks are used to perform the function of the driving dog.

In the center drive type of lathe the main driving force to rotate the work for turning is imparted to the work by means of a chuck which instead of being secured upon the main driving shaft of the head stock is supported upon the bed of the lathe at some convenient point between the head stock and tail stock, which chuck is provided with suitable means to engage and grip the work securely after the latter has been placed between the lathe centers, rotation of the chuck being effected by means of suitable driving connection leading to the main driving shaft of the head stock. Center drive lathes of this particular type had been used for very many years prior to the applications of the patent in suit. Plaintiff has contended that the principal contribution made by its inventors to the art, as disclosed by the patents in suit, is in the provision of small milled surfaces in the web, or webs, of the crankshaft, which surfaces may be either in the form of re-entrant or female right-angled notches, as shown in the second patent, to engage correspondingly shaped projections provided in the chuck, or in the form of projecting lugs on the webs to engage a notch and shoulder in the chuck as in the first patent. In both of these patents the chucks are proportioned relatively to the work in such a manner that no part of the chuck will project over an adjacent line bearing of the crankshaft, thus offering no obstruction to the passage of the turning tools as said tools are fed transversely into the work and so that all of the line bearings of the crankshaft to be turned, as well as the two ends of the shaft which are known as the stub and flange ends will be exposed to the action of the turning tools. A plurality of turning tools in the machine shown in the patents are mounted on tool slides arranged to be fed laterally towards the axis of rotation of the work from both the back and front of the lathe, the tool slides carrying suitable tools for turning the cheeks or side faces of the webs of the shaft in addition to the tools for turning the bearings. The principal difference between the first patent and the second patent is in the substitution of hydraulic means to operate the tool slides in the machine of the second patent for the purely mechanical gearing used for this purpose in the machine of the first patent, together with some slight difference in the details of the construction of the center driving chucks.

In all three of the patents in suit the small milled locating surfaces formed in the web of the crankshaft have the same general location and characteristics and are such that a pair of the milled surfaces are provided, one on each side of the web and substantially in line with the axis of the pin bearing or throw of the crankshaft adjacent to such web or webs. Naturally the surfaces provided in the chuck for engagement with the milled surfaces in the crankshaft web are so positioned relative to the axis of rotation of the chuck that when the crankshaft is placed in the chuck with its milled surfaces in engagement with the cooperating surfaces provided in the chuck for engagement with the crankshaft and the crank lathe is driven to rotate the crankshaft, the rough forged crankshaft to be turned in the lathe will be properly position-

ed to insure the cleaning up of all of the line bearings and the flange and stub ends of the shaft. When the machines shown in the patents are stopped for loading and unloading, the locating surfaces on the chucks are naturally stopped at a point below the axis of rotation so that the shaft can be dropped into position with its milled surfaces resting on the corresponding surfaces provided in the chuck. The chucks of the first and second patents are of the type wherein one of the locating surfaces of the chuck is swung to an inoperative position for facilitating the loading and unloading operation and clamping means are provided to engage the crankshaft at a point substantially midway between the milled surfaces thereof but on the opposite side of the axis of rotation of the shaft and so that when the shaft is placed in the chuck the clamping means forces the milled surfaces of the shaft downwardly into tight engagement with the locating surfaces of the chuck; the movable jaw which provides one of the locating surfaces of the chuck being cooperatively associated with the clamping means so that the movable jaw is brought into engagement with one side face of one of a pair of locating surfaces on the crankshaft to crowd the shaft laterally into tight engagement with the pair of surfaces on the other side. In all three of the patents the pair of small milled notches or lugs form what may be considered as four locating surfaces, each notch or lug consisting of two surfaces at right angles to each other and there are four corresponding surfaces in the chuck. In the first two patents, one of the four surfaces in the chuck is on the movable jaw while the other three are fixed; the principal difference between the chuck of the third patent and the chuck shown in the first and second patents being that the movable jaw of the chuck has been dispensed with so that all four of the locating surfaces of the chuck are fixed surfaces.

The record shows that substantially all the crankshaft line bearing turning machines manufactured and sold in this country at the present time are made either by plaintiff or defendant. It appears from the record that defendant Wickes Brothers was the first one of the parties here to have built a center drive lathe for the turning of the line bearings of the crankshaft, such a lathe having been constructed by the defendant for the Saginaw Products Company of Saginaw, Michigan, on order received by defendant on April 6, 1926, and which machine was delivered to the Saginaw Products company at least as early as September 8, 1926, upon which date the machine was billed by Wickes Brothers to the Saginaw Products Company. This machine was built in accordance with the suggestions of one Herman O. Hess, then superintendent of the Saginaw Products Company, and the patentee of the Hess patent, No. 1,781,229, which patent discloses a center drive unit similar to the one incorporated in this machine built by the defendant for Saginaw Products Company. In using this machine the center line bearing was first turned in a machine of the type which has been designated here as a pot chuck lathe and after the center bearing was turned and ground the finished surface thereof was engaged within suitably formed surfaces provided in the center drive chuck. After the work was clamped in the center drive chuck, all of the remaining line bearings and the flange and the stub end of the shaft were turned in a single operation by a plurality of tools mounted on tool slides fed simultaneously from the back and front of the lathe and which tool slides were provided with suitable tools to turn the cheek portions of the webs. It is admitted by the patentee Groene that he saw this machine in operation before he claims to have invented the lathe and chuck shown in the first patent in 1928, the order for which was obtained by him in August, 1928, drawings made in September, 1928, and the machine shipped December 28, 1928.

The above statement is sufficient for an understanding of the subject matter.

1. In a stipulation entered into between the parties before trial, claims 14, 15, 18, 19, and 20 of the second patent, reissue 19,905, were included by the plaintiff, among others, as the claims upon which plaintiff would rely. Of these claims, 14, 15, 18, and 20, were dropped by plaintiff at the outset of the case. At final argument, plaintiff requested that claims 14, 15, 18, and 20 of the second patent be dismissed without prejudice. Defendant objected strenuously to the dismissal of these claims on the grounds that the setting up of claims 14, 15, 18, and 20, which relate primarily to hydraulic means for feeding tools and details of construction of the tool feeding mechanism, had put defendants to great trouble and expense in preparing for trial and that as to such claims defendant was entitled to a holding of invalidity or at least a dismissal with prejudice. Plaintiff at final argument made a

similar request with respect to claims, 19, 21, 22, 23, and 24 of the third patent No. 2,030,020. These claims were also set forth in the stipulation above referred to, and of these, claim 19 was the only one included in the group of claims which plaintiff stated at the outset of the case were to be relied upon; claims 21 to 24 having been dropped at the outset of the case.

As it is the accepted rule in the federal courts that a plaintiff may take a nonsuit or dismiss at any time prior to the opening of the defense, unless affirmative relief has been asked by defendant, the court granted plaintiff's motion and claims 14, 15, 18, and 20 of the second patent reissue 19,905, and claims 19, 21, 22, 23, and 24 of the third patent, No. 2,030,020, are dismissed without prejudice. While there is included in this group of claims, claim 19 of the second patent, which was not dropped until final argument, the court is of the opinion that the inclusion of this claim along with claims 21 to 24 does not materially prejudice the defendant. During plaintiff's final argument counsel for plaintiff asked the court to include claim 13 of the first patent, reissue 20,090, although that claim had not been mentioned at the outset of the case nor had any testimony been specifically directed to it. The court was of the opinion that the record fully covered claim 13, and therefore this request of plaintiff's was acceded to and claim 13 will be ruled upon along with the other claims in the case.

This court therefore now considers as properly in court for decision claims 13, 18, 19, 21, 22, 23, 24, and 25 of the first patent; claims 19, 31, and 32 of the second patent; and claims 1, 2, 4, 5, 6, 25, 26, 27, and 28 of the third patent.

During the trial and also at final argument, claim 18 of the first patent, reissue 20,090, and claim 19 of the second patent reissue 19,905, were conceded as anticipated by counsel for plaintiff, and claim 18 of the first patent, reissue 20,090, and claim 19 of the second patent, reissue 19,905, are therefore held invalid.

2. There is no disputed material issue of fact in this case. There is nothing to criticize in the conduct of anyone either in the history that preceded the trial or things that happened during the trial. The witnesses on both sides have told the truth. The case therefore is not one of the type where it may be said that because the trial judge heard the witnesses his findings of fact should for this reason alone be accepted by the reviewing court. There are so many angles to this case that a decision as to one of them makes many other questions moot. Having in mind that this is the kind of a case that will be reviewed, and desiring to be as helpful as I can to the reviewing court, I am going to pass on those things which are in the case, even though what I may find as to facts and conclude as to law may make the later holdings appear to be dictum. I realize that certain of the conclusions of law will be against the defendant, who has not been heard in final oral argument. I have heard from defendant sufficiently in the trial of this long lawsuit to get the defendant's viewpoint as to the major issues here involved. If the court is right in holding that the decree should be in favor of the defendant, although the court may be wrong about some of the findings of fact or conclusions of law, the rule in equity is that when the case is brought up for review by the appellate court it will review the whole case and if, in doing so, it finds that the decree is right, even though the reviewing court may disagree with me about certain things, it will affirm the decree. While the defendant may not attack a decree in its favor, it may urge on appeal any matter appearing in the record in support of the decree, even though this may involve an attack upon the reasoning of the lower court or insistence upon matter overlooked or ignored by it. U. S. and Interstate Commerce Commission v. American Railway Express Co., 265 U.S. 425, 435, 436, 44 S.Ct. 560, 563, 564, 68 L.Ed. 1086.

3. While some of these claims in suit have narrowing features, they are the type that when it comes to the question of infringement I would apply the doctrine of equivalents, and I do apply it in this case on the theory that if these patents have any value then they are for something broader than these narrowing features. The intended meritorious parts of the claims, disregarding the prior art, were for something other than such things, as, for example, the way you fasten the clamp when it is in locked position. Although I see differences between the defendant's construction and the narrowing features set forth in certain of the claims in suit, so that I could hold these claims not infringed, if I were to do so I would have the patent whittled down until it would not be worth anything and so that there would be too many ways to escape infringement. A fair way is to apply the

doctrine of equivalents and say that defendant has used the method defined in the method claims and has used the machine defined in the various machine claims, and I so hold. Those slight differences ought not to sustain a patent and if a patent is good these little differences ought not to escape infringement. We ought not to lumber up an art with a lot of patents on little details that are clearly mechanical.

■ 4. There are many, many questions of law here that are of interest. Although I have not heard counsel for defendant finally upon the proposition, the argument was made during the trial by defendant that as a machine and a process were different statutory classes of invention, and that the reissue of an original patent, which original patent contained claims drawn to the machine disclosed therein, could not· validly contain reissue claims drawn to the process performed by the machine, it being urged that as a reissue must be drawn to the same invention as claimed in the original patent the insertion of process claims in the reissue was·not the claiming of the same invention. It is my opinion and conclusion of law, that a process claim can be joined with a machine claim in an original application for patent, and if the rules of the Patent Office and the law are complied with relative to a reissue, this same rule applies to a reissue and that you can reissue a patent adding either machine claims or process claims if the machine and the process be so related that joinder of such claims would have been proper in the original.

■ 5. I do not think, however, that one can disclose, as was done in this case, in the original application for the first patent, a process and not claim it, and then wait for more than two years after the original patent has issued and then file a reissue for that patent, inserting process claims broader than the machine claims, and that could not be done if there were only one patent involved and one man involved. If he files an application for 'a patent originally containing only machine claims, has his original patent granted, and waits for more than two years, I say that he could not then ask for a reissue and put in the broader process claims. I do not think there is any dispute about this part of the law. Vandenburgh v. Truscon Steel Co., 6 Cir., 277 F. 345, affirmed 261 U.S. 6, 43 S.Ct. 331, 67 L.Ed. 507; Webster Electric Co. v. Splitdorf Electric Co., 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792. This, however, is not just what was done here. The process claims were not added onto the application for reissue of the first patent but were included in the application for reissue of the second patent which was filed by the patentees Groene and Luning. This second patent at the time of the application for its reissue had not been issued for more than two years, but at this time the original of the first patent had been issued for more than two years and disclosed as Groene's sole invention the process defined by claims 31 and 32 of the second patent, reissue No. 19,905. I am passing on this point here just as if the second patent were granted on the sole application of Groene. As a matter of fact, the second patent was not filed by Groene as a sole inventor but as a joint inventor with Luning. But I say, as a matter of law, that if Groene had been all alone in that second patent he could not wait for more than two years after the process had been disclosed to the public in the first patent and then file claims to such process in a reissue of the second patent and obtain a valid reissue simply because the latter had not been issued for a full two years. I therefore hold all of the claims in suit of the second patent invalid and void.

■ 6. While I recognize the just liberality of the courts in passing upon patents for joint inventions where two men have been working together on a machine and they hardly know themselves which contribution has been made by the respective parties, we have a situation here where there is no question in the world but that Groene alone invented the method set forth in claims 31 and 32 of the second patent. Groene so stated on the witness stand and counsel for plaintiff also so stated repeatedly during the trial. The second patent, however, was filed on the joint application of Groene and Luning and their joint effort was for an improvement on the machine disclosed in the first patent. Luning had no part in the method, as the record clearly shows. This party Luning that joined with Groene in the second patent, whether it be an original application or whether it be in a reissue application, could not properly make the affidavit as to the process claims 31 and 32 that the law requires. It was not his invention at all. This is conceded and clear on the record, and therefore, for this additional reason, I hold as my conclusion of law that the second patent is invalid and void.

■ 7. Counsel for plaintiff has argued that as both of these applications were assigned to the one party, namely, the plaintiff

in this case, the Le Blond Company, it had the right to decide in which case it would place the process claims. The application for a reissue of a second patent was wrong ab initio, and I hold that the things that are wrong cannot be cured by an assignment. It would make a bad situation in the patent law if people could make untrue affidavits and then they could be cured by an assignment. I hold the assignee gets what the assignors had; if what they had was bad, then what the assignee gets is bad. If it is void, what he gets is void. This is a well-established rule of equity, and I do not think we have to go to any statute and have a narrow definition of it unless some statute expressly covers the case and says it does not make any difference, but as there is no such statute, I hold that two men cannot apply originally for what one man has invented.

8. Counsel for defendant has urged very strenuously that the affidavits for reissue of the first and second patents are bad because of the failure to comply fully with rule 87 of the Rules of Practice and that under the decisions of this circuit, this should alone be sufficient to defeat these reissues. I rule against defendant on that point as a matter of law under the facts as disclosed here, although I agree that the Patent Office should be more careful and exacting about applicants for reissue telling when they allege mistake, what mistake, and when they allege inadvertence, what inadvertence. This is not really clear here from the affidavits, but it is clear to my mind from the whole situation that there are some things in the affidavits which, while perfectly true, are misleading concerning the conclusion to be drawn as to what the inadvertence or mistake was.

9. Before I leave claims 31 and 32 of the second patent, I wish to discuss said claims from the standpoint of the prior art. They are limited almost entirely to the kind of a chuck to use. They are void because they read upon the disclosure of the second Bogert patent, No. 920,420. In these process claims, as well as in a large number of the claims of the third patent, the notches hereinbefore referred to as milled in the crankshaft webs to form the locating surfaces are described with the solemnity of Solomon's Temple. They are described in very ponderous language, but when you get through with them they read right on the prior art. The process claims mean that in turning a crankshaft it is to be seized by having two planes fixed in the web in such direction as to be at right angles to each other. This language, however, fits exactly with the disclosure in the Bogert patent as to the location of these planes. While it is true the planes disclosed in the Bogert patent are larger than the small notches claimed by plaintiff to be their contribution to the art, the description of these notches in the two process claims, 31 and 32, are not limited to the size of the planes shown in the patents in suit. I do not think, however, you can get a valid patent in this country on big cars and little cars, or on big planes and little planes. Estey v. Burdett, 109 U.S. 633, 3 S.Ct. 531, 27 L.Ed. 1058; Steel Wheel Corporation v. B. F. Goodrich Rubber Co., 27 F.2d 427, D.C.E.D.Mich., affirmed, 6 Cir., 42 F.2d 406. You make the planes the sizes you want them. If this were not so and it came to the question of infringement, nobody could tell what was a big plane and what was a little plane. The size of these planes has been urged upon me as being the important thing in the case, but the record shows it was not new in 1928, when the application for the original of the first patent was filed, to provide small notches in the web of a crankshaft as such notches were provided as early as 1922 for indexing crankshafts for the turning of the pin bearings by the Studebaker Company for use in machines manufactured by the defendant.

In this connection I feel that an important feature in this case is that in the machining of the line bearings of the crankshafts in machines of the type here involved, the crankshaft is properly centered at its ends before it is placed in the machine to be machined. This was an old and common practice and after the center holes were drilled in the end of the shaft at the desired points it was easy to put the shaft in the lathe on the lathe centers. When the center holes have been properly placed in the ends of the shaft, an absolutely straight line between the two centers should be centered on the axis of the shaft after it has been turned and finished in the lathe and the problem, if any, was to turn the shaft so that when you got through you had not changed appreciably the proper axis of the shaft, or, in other words, so that the axis of the entire shaft would remain in the straight line established between the two center points before it was put in the lathe, or at least so that any distortion of the shaft as the result of the turning operation would be kept within a matter of thousandths of an inch. The process described in the two claims of the

second patent for accomplishing this was that of holding one of the webs between the line bearings in two directions while it was being turned. There does not seem to have been any great problem in this although there was a great deal of testimony concerning the large forces involved. The greatest strains placed on the shafts are torsional strains, but these are in a large measure equalized insofar as any lateral components are concerned which would tend to bend the shaft because of the fact that the tools are applied to both sides of the shaft at substantially diametrical opposite points thereof.

The method provided by Groene for doing that was to have planed places on two sides of the crankshaft web at right angles to each other. Claims 31 and 32 of the second patent do not describe it just in that way, but that is what the claims mean when you read them. This is no part of the lathe but is a necessary thing for the use of the lathe that those two planes be cut accurately and at a proper predetermined distance from the axis of the camshaft or the straight line between the two center points in each end. In so far as the lathe is concerned, it was necessary that the chuck have planed surfaces also at right angles to each other, to fit into the planed surfaces on the crankshaft web and that these surfaces be at the same predetermined distance from the axis of rotation of the chuck which coincides with the straight line joining the two lathe centers and that after the crankshaft is placed in the chuck it would be crowded or clamped against the planed surfaces on the chuck to serve as indexing means, as a guide, as a holder, which, when the chuck was rotated, would insure the rotation of the work at all times so that the predetermined axis of the work and the predetermined axis of the chuck would be coincident.

That is just exactly what this old fellow Bogert did in his second patent, No. 920,420. The claims read just as readily on Bogert's second patent as they do on what the plaintiff's patent shows and on what the plaintiff does in its actual machines. So I say that the method was old and disclosed in the art. Bogert in his second patent, the application date of which is away back in 1904, gets entirely away from what he had shown in his first patent, No. 568,063, both of which show center drive lathes, where he showed a chuck provided on opposite sides with screws to be brought up against the side of the crankshaft web and which introduced the danger of pushing the crankshaft out of alignment. The second Bogert patent gets entirely away from that danger by providing two fixed sides in the chuck against which the crankshaft would be clamped for turning. Plaintiff has argued strenuously that the Bogert patent does not disclose the method because Bogert planed the whole side of the crankshaft web and not just a small notch in the web and has urged that with the present day standards in the automobile industry it would be impossible to plane the whole side of the crankshaft web. I see no merit in this contention, nor do I think it argues patentability. When one considers the type of crankshaft with which Bogert had to deal back in the early days of the automobile industry in which the webs of the crankshaft were what might be termed today, modernistic shapes, straight lines and angles, the simplest way for him to provide the machined locating spots on the crankshaft webs naturally was to plane the whole side, which gave him very large holding surfaces. There is nothing in the way that Groene brought his tool up to the work or brought it back to the work. After he turned the first one, there was nothing more than mechanical ability in turning the others. The only elements in the claims in suit of the first patent, as I see it, that suggested the allowance of the patent, was in the kind of chuck, the way it took hold of the web without covering a line bearing and held it in the desired alignment for turning.

As far as the holding problem was concerned, Bogert described that, and in the first Bogert patent, No. 568,063, he did turn the bearings right next to the chuck, but if he had a shaft and a chuck of such size that his chuck projected over the adjacent bearing, there was nothing to prevent him from cutting the chuck off so that it would not project over the shaft. You can take Bogert's chuck and make it so that it would expose the center bearings and all of the bearings for turning, and the only difference I can see between the Bogert and Groene ideas is that Bogert planed the whole side, which, of course, would tend to cause the chuck to hold the web more solidly. Bogert was dealing with the crankshafts of his day, and it was easier for him to plane the sides than it was to cut a notch, at least he did it that way—the larger the contacting planed surface the more rigidly the shaft is held. It so happened that by the time Groene

got around to making his machine the industry was not using those straight line modernistic shapes of crankshafts but crankshafts with webs of irregular shapes so that he had a different thing to contend with but he held the crankshaft in place for turning in absolutely the same way as Bogert did, by the two fixed planes and clamping the crankshaft against the two fixed planes; the same old mechanical, mathematical principle that had been in existence long before Bogert; absolutely the same principle, as I see it, in both Groene and Bogert, and I do not see the slightest difference in the clamping means used on the sides opposite to the two fixed planes. There are too many ways of fastening things for these slight differences to be of any importance. While I realize there are many things to be taken into account that are liable to fool a judge when you are dealing with a big heavy machine, I think we are more likely to fail on the side of exaggerating the difficulty than of minimizing it. If you are going to hold something against two fixed planes, the ways to do it are very numerous for different mechanics. Different mechanics will work it out in different ways; some will be better than others. There are so many ways of locking things that I do not think we need to bother with these details; whether it is an eccentric or not an eccentric, I do not think that matters because that is one of the ways of locking things. That is the way they lock the window against the jamb by having a pivoted eccentric with a handle on it. You may have a screw and screw it down, or you may have a lever and pull it up—the big thing that Groene thought he discovered was those two fixed planes to support the crankshaft against and means to crowd the crankshaft against those two planes. Bogert did it in just exactly that way. He had two planed faces at right angles and on the third and fourth sides he had movable parts that locked and held the crankshaft with its predetermined planes, firmly against the predetermined planes of the chuck. I doubt, even, that it was invention at the time that Bogert did it. Surely it would not be invention, having found out how to turn the bearing nearest to the web of the crankshaft, to add the necessary tools to turn all of the other bearings clear to the last one. I have not lost sight of the fact that it is not an easy mechanical job, because you are dealing with parts that have to be machined with great accuracy and I do not mean that any old mechanic or any old

blacksmith could obtain the desired result, but for the men skilled in this particular art and in the building of tools of this kind, the very accuracy and strength we talk about is not, in my opinion, the work of a genius but the work of a mathematician and the highly skilled men in this industry.

■ 10. Now we come to the third patent. This is what Groene and his joint inventor did in the third patent. In the first patent he had two fixed sides or surfaces on one side of the chuck forming a notch in the chuck and a crankshaft with two milled or planed surfaces in the form of male projections to engage within said notch. Then, on the other side of the chuck, he had a fixed flat surface and a movable surface on a contraption that came up and held the projection on the crankshaft into the notch and a clamping device which came down over the top of the crankshaft to force the shaft rigidly against these surfaces in the chuck, and I have in mind that the last-mentioned clamping device pulled over and tightened the first contraption. These devices, however, are but a matter of locking the thing in place and making it solid. You can of course say that with anything that is put on with a screw the screw may come out. If it is nailed up, the nail may come out. If it is bolted, the bolt can come out. If you have a lever that brings a thing up solid to lock it in place, it may become unlocked. As the chuck of the first Groene patent functioned, the third patent is only the chuck of the first patent after it has been locked in place. The chuck of the third patent functions just exactly the same as the first chuck functions. They both act to hold the shaft rigidly in two directions. It is only in the way that you get them in position that there is any difference. In the first patent, he had two fixed means, one a female notch in his chuck, with two planed surfaces at right angles on one side of the chuck, and on the other side of the chuck a third fixed surface with a movable jaw which when it was moved to locking position formed a second female notch. Now what he did in the third patent was to put the notches in the work on both sides and have the chuck with fixed male parts into which the notches of the work would drop, and of course clamp the work down into these notches with a single clamp from the top. I recognize that if you can do away with one element of a device and still do the same work, you may obtain a valid patent, or, if you add an element to a

380

·device and do something new and useful, you may obtain a patent, but this all depends again upon how much skill is required to make these changes and whether it is the work of a mechanic or a genius.

We have in the third patent claims for an invention that may be said to move in the opposite direction from what we usually find to be an invention. When we make the shift as between something movable and immovable, the usual thing is that we find difficulty because of the disadvantages of fitting a thing into a place and we make a part movable so it is easier to get the thing in place. Here we find the part movable in the first patent, whereas in the third patent, instead of making the third side movable, Groene and his associate made it a fixed part. I say that is the work of a mechanic and that it grew out of the experience in using the other machine. They found they could mill these notches in the crankshaft with accuracy, but they had to mill them with accuracy anyway. If the tolerance were greater and as much as one-half inch, one would not be able to accomplish this thing without much experimentation, but they learned that it was necessary to make them with such accuracy anyway that there would not be more than four one-thousandths of an inch tolerance, less than the thickness of a sheet of a newspaper, and they decided that inasmuch as the notch and the chucks have to be made with that degree of accuracy anyway, the workman could slip the shaft into place in the chuck without having one of the locating surfaces of the chuck move at all and that the shaft would be tight enough after it was in place.

That is not invention. It is a step backward so far as assembling is concerned, but if it had been rigid in the first place and somebody had obtained a patent on opening the jaw to make the assembling easier, I would say, no patent on that—that, too, is the work of a mechanic.

The only difference between the third Groene patent and the first is that the third side, instead of being a swinging side that went up to ·the work and was clamped tightly to it, now is made rigid, and by reason of the accurate work that they turn out it is tight enough.

The decree, therefore, will be for the defendant, holding all the claims in suit of these patents void, and dismissing the bill with costs to be taxed.