OXFORD VARNISH CORPORATION et al.
v. GENERAL MOTORS CORPORATION
et al.
No. 7240.

District Court, E. D. Michigan, S. D.
June 6, 1938.

William J. Belknap, William H. Gross, and Whittemore, Hulbert & Belknap, all of Detroit, Mich., for plaintiffs.

Stuart C. Barnes, Arthur Raisch, and Barnes, Kisselle, Laughlin & Raisch, all of Detroit, Mich., for defendants.

TUTTLE, District Judge.

This is a suit for infringement of patents. Oxford Varnish Corporation is the owner of the patents in suit. Motor Products Corporation has certain exclusive license rights under the patents, particularly in the automobile industry.

The patents have to do with wood graining solid surfaces, particularly metal. The principal patent in suit is the Henry patent 1,548,465, issued August 4, 1925. Claims 1, 2 and 5 are in suit and quite similar (see footnote [1] for claim 2). This patent purports to be a broad patent on the process of wood graining solid surfaces by first photographing stained natural wood, producing the wood pattern in intaglio on a metal plate by the well-known photogravure process and then by an elastic roll transferring the pattern from the inked pattern plate to the solid surface. The process described and claimed involves certain technical steps in photography and etching which need not be detailed here. It is sufficient to say that the photogravure process of reproduction of objects was old and well-known at the time of the alleged Henry invention. It was described fully in the Saalburg patent 923,799, June 1, 1909, and particularly in The London Times, pages 157 and 158, issue of September 10, 1912.

The Henry application was filed November 2, 1916. It was repeatedly rejected by the Examiner on the ground that there was no patentable invention in photographing stained natural wood in place of some other object and then producing etched plates by the well-known photogravure process. Nor could the Examiner find that there was invention in taking the pattern off the metal plate by means of an elastic roll and printing it on metal or any other hard substance. The Examiner relied particularly on The London Times, September 10, 1912, pages 157 and 158, British patent to Leicester 13,987 of 1914, The Inland Printer, March, 1914, page 904, and Saalburg 923,799. Appeals were taken first to the Examiners-in-Chief, and then to the Commissioner, and the Examiner was affirmed. Then an appeal was taken to the Court of Appeals of the District of Columbia. On the record before that Court, the Court held that Henry was entitled to a patent on his process as Henry was the first to have the idea of photographing a piece of natural wood and producing an etched plate from which a wood grain pattern could be printed. The Court stated that the only prior patent in the graining art that was before it was the Herzog patent 700,493, and Herzog had no conception of using an etched master board, In re Henry, 55 App.D.C. 396, 6 F.2d 699.

---

[1] (Henry patent 1,548,465, August 4, 1925)

Claim 2. The process of reproducing the grain of wood on a solid surface which consists in staining the piece of wood to be simulated to accentuate the grain thereof; producing a photographic negative of the wood so prepared; producing from the negative a grained plate, the recesses produced by the graining varying in depth with the shade to be produced and arranged to simulate the graining of the original material; filling the plate with coloring matter; withdrawing the coloring matter from the recesses of the grained plate by means of an elastic roller to which the coloring matter adheres; transferring the coloring matter from the elastic roller to the surface to be grained and merging the masses one into the other so as to obliterate the lines of union.

564

The second patent in suit is the Casto and Lang patent 1,807,894 issued June 2, 1931 on an application filed August 16, 1926. The claims involved are 14, 23, 25, 27 and 28. Claims 14 and 23 relate to the use of a tray that carries the work on the conveyer in a graining machine, which tray has "a roll approaching end thereof shaped to protect the surface of the take-off roll when the work is brought into contact therewith." As shown in the patent, the tray has the front edge rounded and the front portion of the tray extends up flush with the top of the work to protect the soft transfer roll from the edge of the work as the work passes under the gelatine roll. The subject matter of claim 25 and the remaining claims of this patent is a support or fixture to fit in the underside of an irregular piece of work passing through the graining machine to prevent the work from being crushed. (See footnote[2] for claims 14 and 25, which are illustrative of all the claims.)

The third and fourth patents in suit are the Von Webern and Hamant patent 1,-900,030 issued March 7, 1933, on an application filed May 28, 1930, and the Casto and Von Webern patent 1,946,483 issued February 13, 1934, on an application filed May 28, 1930. These are patents on a machine and process respectively for graining hollow articles, such as boxes. The defendant, General Motors Corporation, Ternstedt Division, grains a hollow article on the inside, to-wit: the so-called garnish molding used in window openings in automobile bodies. The defendant, Cerre, Incorporated, formerly The Free Press Photogravure Company, makes the rolls for defendant General Motors Corporation, Ternstedt Division. The machine shown in patent 1,900,030 comprises a set of vertical graining rolls, to-wit: one metal pattern roll and one gelatine transfer roll, together with a pressure roll for holding the work against the transfer roll. This pressure roll can be quickly separated from the transfer roll and again pressed against the transfer roll by means of a hand lever or a foot pedal. This permits the box or other hollow article to be set down over the pressure roll on a horizontal table. When the pressure roll presses the work against transfer roll, the non-circular work is driven bodily around on the table as all the rolls are positively driven by power. Claims 7 and 8 of this patent are in suit. Claim 7 of this patent is quoted below in footnote[3].

The process patent 1,946,483 shows, in Fig. 3, substantially this same machine arrangement, while in Figs. 1 and 2, it shows another conception of the process wherein

---

[2] (Casto and Lang patent 1,807,894, June 2, 1931)

Claim 14. In a graining machine of the character described, the combination of a grained metallic roll, a resilient take-off roll and a conveyer means for bringing the work to be grained into contact with the surface of the take-off roll, said conveyor means including a work supporting tray having a roll approaching end thereof shaped to protect the surface of the take-off roll when the work is brought into contact therewith.

Claim 25. In a graining machine, a resilient roll adapted to transfer a pigment pattern to work in the machine, pressure means arranged to hold a piece of work in printing contact with the resilient roll, and cooperating means to support an elongated sheet metal blank of non-planular cross section for presentation to the resilient roll, said means comprising a device having a relief and indentation effect thereon adapted to enter corresponding indented and raised portions of the sheet metal blank on the back thereof to afford a strong support for such blank at the region of printing contact between the resilient roll and said pressure means.

[3] (Von Webern and Hamant patent 1,-900.030, March 7, 1933)

Claim 7. A surface decorating machine, comprising a frame, a transfer applying roll rotatably mounted on a substantially vertical axis carried by the frame, a pattern roll mounted to rotate on a second substantially vertical axis carried by the frame, a pigment well located in said frame, means to apply pigment from the well evenly to said vertical pattern roll, a guide adjacent the roll for supporting work and a roller projecting upwardly from the supporting surface of the guide, there being means below the guide to carry the roller into contact with work on the guide, and press the same against the transfer roll.

(Casto and Von Webern patent 1,946,-483, February 13, 1934.)

Claim 1. A method of decorating the surfaces of articles having relatively abrupt bends, comprising supporting the article adjacent a moving pigment applying member, continuously supplying a pigment pattern to the member, and continuously applying rolling pressure to the surface of the article opposite the pigment applying member to thereby cause the article to be frictionally driven bodily while

all the rolls are horizontal and the hollow article is not supported by a table but is allowed to flop through a vertical plane as it is driven around by the rolls. See note 3 for claims 1 and 4 of the method patent 1,946,483, which are the only ones in suit.

The defendants have made the charge that the plaintiffs, and particularly the Oxford Varnish Corporation, come into court with unclean hands. But, as I understand it, it is not defendants' desire that the bill of complaint be dismissed on this ground. The circumstances upon which the defendants rely are these:

■ The Henry application and patent originally belonged to the National Cash Register Company. The Vance Manufacturing Company, through one Talbot, had certain exclusive rights to practice the Henry Process. In the fall of 1924, the Vance Manufacturing Company advised the Remington Arms Company that it could no longer furnish the Remington Company with equipment to grain cash registers. This was, apparently, due to the arrangement that Vance had with the National Cash Register Company which sought to exclude National's competitors from using the graining processes on cash registers. The Remington Arms Company called this matter to the attention of the Oxford Varnish Corporation. In August, 1925, the Henry patent issued. The correspondence between the Remington Company and the Oxford Company and their attorneys shows that, unmistakably, at this time, neither the Oxford Company nor the Remington Company regarded the Henry process as patentable or the .claims of the Henry patent, that later issued, valid.

In the fall of 1925, the Remington Company discovered a prior use at The Cott-a-lap Company, Somerville, New Jersey. This prior use began in 1914, more than two years before the Henry application, and has continued to this date. It consisted of photographing natural wood in which the grain lines were brought out by a filler rubbed into the wood. The wood grain was reproduced upon copper cylinders by the well-known photogravure process. An offset gelatine, and later a rubber roll, was used to print on oil cloths or floor coverings. Plaintiffs do not dispute that this took place at The Cott-a-lap Company at the time claimed. They contend the prior use at Cott-a-lap was quite a different thing from the Henry process. Charles P. Stirling, the man who made the etched rolls for The Cott-a-lap Company in 1914, now an employee of the plaintiff, Oxford Varnish Corporation, testified in open court. There is an abundance of records to establish, unmistakably, the facts and the dates. It is plaintiffs' contention that the wood was not given a graduated stain as is the case with Henry, but only the grain lines were filled in with a dark filler. They admit that the photogravure process was used, that the natural wood was photographed and a screen used, but they contend that, by reason of retouching the negative and the deep etching of the copper plate, the intermediate tones, which are characteristic of photogravure work, were designedly eliminated in the practice at The Cott-a-lap Company and that, therefore, there is no anticipation of the Henry process. It is the contention of the defendants that the processes are essentially identical and that there are some intermediate tones in the Cott-a-lap graining.

In the winter of 1925 and 1926, the Remington Arms Company procured the affidavits of C. P. Stirling, the man who made the rolls at Cott-a-lap, R. C. Jeffcott, the dominating figure in The Cott-a-lap Company, and W. W. Bott, the secretary of the company. These affidavits contain a complete statement of the facts and numerous records corroborating these facts.

In March, 1926, the Vance Manufacturing Company and the National Cash Register Company sued the Oxford Varnish Corporation for infringement of the Henry patent. Mr. Albert R. Golrick, the Oxford patent attorney, promptly got in touch with the Remington Arms Company patent attorneys, to get further affidavits of the Cott-a-lap prior use and interview the wit-

---

allowing it to swing freely in the general plane of the article as required by the successive bends thereof.

Claim 4. The method of decorating articles having surfaces deviating from a single plane, said surfaces having edges lying in a common plane, comprising supporting the entire weight of the article on a guide contacting the edges, presenting the surfaces to a moving pattern transfer member and continuously applying rolling pressure to the other side of the article surface opposite the pattern transfer member, and thereby causing the pattern to be continuously transferred to the contacted surface while the article swings freely, supported on the guide.

nesses. Golrick and one of the Remington attorneys made several trips to the Cott-a-lap plant, interviewed the witnesses and, in May, 1926, the Remington attorneys prepared some additional affidavits of T. A. Flockhart, Dr. R. W. Cornelison, Leo P. Epstein, and the second affidavit of W. W. Bott. Copies of these affidavits were sent to Golrick for his suggestions and criticisms and were finally executed by the affiants. Before these new affidavits were executed, however, Golrick had taken the already executed affidavits to Dayton, Ohio, to interview the representatives of the plaintiffs in the suit that had been brought against Oxford. These affidavits were shown to representatives of the plaintiffs. Later, two of the attorneys who represented the plaintiffs went to The Cott-a-lap Company to interview some of the witnesses. No answer had been filed in the suit. In view of these affidavits, it was agreed that the whole matter should be submitted to Frank Parker Davis, an able and well-known patent lawyer of Chicago, Illinois, to get his opinion of the bearing of the Cott-a-lap prior use on the validity of the Henry patent. Accordingly, in August, 1926, Golrick took all the affidavits to Chicago where he and some of the representatives of the plaintiffs had a conference with Mr. Davis. In a letter dated September 9, 1926, to the National Cash Register Company, Mr. Davis reported great doubt as to whether the patent could be sustained in view of what took place at The Cott-a-lap Company and suggested the wisdom of effecting settlement of the lawsuit.

In January, 1927, the Oxford Varnish Corporation settled the suit by agreeing to pay the Vance Manufacturing Company $100,000 and buying out all the stock of the Vance Company from Talbot for $50,000. It is the testimony of Talbot and Casto that Talbot and his associates got the whole $150,000. A consent decree was taken, sustaining the patent and holding Oxford an infringer. Certain royalties were to be paid to the National Cash Register Company, to-wit: $2,000 a year, and certain royalties to Talbot. It is the claim of the Oxford Varnish Corporation that, before they purchased Vance, they had changed their opinion as to the validity of the Henry patent and were forced to purchase the Vance Manufacturing Company in order to protect themselves.

The National Cash Register Company and the Remington Arms Company about May, 1926, settled extensive litigation which they had had involving the Gubelmann and other patents. In the fall of 1926, the National Cash Register Company wrote the Remington Company that, thereafter, they would allow the Vance Manufacturing Company to supply Remington with graining equipment. In February, 1927, when Remington learned that Oxford had purchased the Vance Manufacturing Company, they insisted that the National Cash Register Company or Vance grant them a free license under the Henry patent with one restriction, namely, that they should purchase their equipment from Vance unless they could get it elsewhere for 50% or less of the price Vance asked. Vance, with the approval of National, granted this license to Remington.

The record shows that in October, 1925, one of the Remington patent attorneys suggested to the president of the Remington Company that he advise the Simmons Company of the Cott-a-lap prior use. Casto, the President of Oxford, testified that he asked Remington to so advise Simmons but he stated that he does not know whether Simmons ever did learn of the Cott-a-lap prior use. In April, 1927, Simmons was accorded an agreement with Oxford and Vance whereby Simmons could continue to purchase plates at the rates that they had previously been paying and would have the right to use the plates purchased as master plates for reproducing for Simmons' own use further plates by the electrolytic or other process and without any further consideration. Simmons, one of the largest manufacturers of metal bed furniture, had, up to the time this suit was brought, paid Oxford about $14,000 for plates under this arrangement. It is the contention of plaintiffs that this arrangement was made with Simmons to prevent Simmons duplicating electrolytically plates which they owned and selling them to the trade.

Shortly after Vance was purchased by Oxford, Oxford jumped the prices of the plates sold to Remington from $75 a plate to $180. Some time after the purchase of Vance, Oxford and Vance started the granting of licenses on the basis of the licensees paying a royalty of one cent (1¢) a square foot for all surfaces grained, provided the materials utilized in the process were purchased from Oxford, and a royalty of three cents (3¢) a square foot where the materials were purchased from outside

sources. This Court, Judge Reeves sitting, held that these contracts violated the Clayton Act, 38 Stat. 730, and the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The Circuit Court of Appeals in the Case of Oxford Varnish Corporation et al. v. Ault & Wiborg Corporation, 6 Cir., 83 F.2d 764, affirmed this decision and stated that the three cents (3¢) royalty resulted in a penalty of Two Dollars and Seven Cents ($2.07) for each gallon of material used in the licensed process. The decision of the Circuit Court of Appeals was handed down May 8th, 1936.

The record also shows that in the summer of 1926, it was sought to settle the Vance-Oxford suit by the owners of the Henry patent granting free licenses to Remington, Cott-a-lap and Oxford. There was a conference among the attorneys for Remington, Oxford and some of the officers of The Cott-a-lap Company the last of August, 1926, relative to settling the Oxford-Vance suit and arranging these licenses to the several parties, but plaintiffs claim nothing came of this conference and that they were not able to put this deal through with Talbot and the only thing to which Talbot would agree was to sell Vance to Oxford with the royalty arrangement that was finally effected.

In June of 1928, Oxford purchased the engraving business of The Cott-a-lap Company for $10,000 cash and an agreement to pay 25% of whatever was received for all photogravure rolls sold by Oxford other than those for printing imitation wood and marble effects on hard surfaces less, however, the cost of the unetched roll or plate. Vance-Oxford guaranteed Cott-a-lap should receive a minimum of $6,000 per year for thirteen (13) years. However, if, in any one year, during the first three and one-half, should Cott-a-lap's share be equivalent to $7,500, then the Oxford-Vance minimum obligation would be boosted to $10,000 minimum each year for the remaining years of the contract.

The Oxford-Vance-Cott-a-lap contract gave Cott-a-lap "an exclusive license in the manufacturing industries pertaining to floor covering manufacture of the linoleum type under any and all patents or inventions and secret processes owned, used or controlled by Vance-Oxford."

In September, 1928, Oxford hired Charles P. Stirling, who had not been connected with The Cott-a-lap Company for some years. They hired him on a part time basis and he has been an employee of the Oxford Corporation ever since. Stirling is the engraver who had made the Cott-a-lap rolls.

On August 27th, 1931, Stuart C. Barnes, attorney representing Fisher Body Corporation, wrote The Cott-a-lap Company inquiring about the graining process and asked Cott-a-lap for information. The Cott-a-lap Company sent Barnes' letter to the Oxford Varnish Corporation which returned Barnes' letter with a notation of what to write Barnes. The Cott-a-lap Company exactly copied this notation in writing Barnes. They stated in their letter: "We have never manufactured any metal products nor have we manufactured photogravure printing *plates.*" This statement was calculated to mislead the inquirer, for Cott-a-lap had manufactured large numbers of photogravure *rolls* for graining produced by a process very similar, if not identical with, the Henry process.

In August, 1929, the Nuzum Electrotype Company of Milwaukee, Wisconsin, was sued for infringement. A skeleton answer was filed with no citation of prior art and, by stipulation, the suit was dismissed on September 25th, 1930. Plaintiffs claim that the suit was dismissed because they could not get service on A. C. Horn Company which was also a party.

December 28th, 1929, Vance and Oxford sued the A. C. Horn Company on the Henry patent in the Eastern District of New York, Equity No. E–4677. Extensive depositions were taken relating to the prior use at Cott-a-lap, the Nashua Gummed and Coated Paper Company, and elsewhere. These depositions were never filed. In October, 1931, just before the case was to come to trial, the A. C. Horn Company's attorney wrote the Oxford attorney suggesting settlement, stating: "If the defendant is successful in invalidating the patent in suit, it will apparently merely create additional competition for both the plaintiff and defendant." Thereupon, the parties got together and entered into a license agreement dated the 24th day of November, 1931. In consideration of One Dollar ($1.00) and mutual covenants, the A. C. Horn Company was granted the exclusive rights under the Henry and other patents for all the Atlantic seaboard states and also the State of Vermont with certain exceptions involving special products as to which, apparently, Oxford was obliged to protect outstanding exclusive li-

568

censes. Horn was to pay Oxford-Vance 25% of all money collected as royalties, 10% of all money paid Horn for graining equipment and 2% of all money received for paints, lacquers, etc. The contract also required the Twenty-five Dollars ($25.-00) rental per month from licensees if paints, lacquers, etc. were not purchased from the Horn Company.

On December 3d, 1931, a decree was entered holding all the claims of the Henry patent valid and infringed and specifying that the plaintiffs recover $25,000 in settlement of all plaintiffs' claims against the defendant in suit. It has been proved here that the $25,000 was never paid, and, in fact, at the time the contracts were delivered, a waiver was delivered to the Horn Company waiving the payment of the $25,-000 provided the Horn Company complied with Section 11 of its contract which required the Horn Company to use its best efforts to promote the use of the patented process in its territory. It is the contention of the plaintiffs that this $25,000 decree for past infringement was a perfectly legitimate security that it was using to hold over Horn's head to make sure that Horn performed its contract with Oxford-Vance. Very shortly after the decree was entered, the General Motors Corporation was advised by both Oxford and its attorney Golrick of the successful outcome of Oxford's suit against Horn.

I do not find that plaintiffs' hands are unclean. I believe, however, that all this evidence of what took place, and Oxford's explanations, have a place in this lawsuit.

These four patents have the presumption of validity that goes with every scrap of paper issued out of the Patent Office. The president of the Motor Products Corporation testified that his company had paid Oxford upward of $475,000 in royalties and principally under the Henry patent. If these payments were unexplained, they would add strongly to the presumption of validity. So many able and big business men have paid tribute to these patents that I would lean backward and resolve every doubt in favor of the plaintiffs on these patents if the motives back of such payments had not been proven.

There is enough to this case to destroy any argument like that. These patents are no better than the cheapest paper patents and the reason I say that is because all of the tribute that has ever been paid to them has been shown to be selfish tribute.

There is always the danger of taking a patent that is worthless and the two litigants splitting it up and each taking half of it, and saying, "Well, we will fight the rest of the world with it," and at the same time make the kind of showing that looks as though they both did think it was good.

That is what has happened here. There is always the temptation to reach some agreement by which the patent will be declared valid and the defendant take a license, and then the two parties go out and fight all the rest of the world. In the case at bar, the result could not be accomplished by splitting the rights under the patent in two pieces. They found it necessary to divide the patent with many corporations and into many sections. Of course, after they got into the big money, they were able to pay large sums back and forth but it is plain that they were trying to use worthless patents to stifle competition and regulate prices.

There has been a joining together of a large number of minds to use these patents, and particularly this Henry patent, as a means for controlling the market.

In the settlement of the suit against the Horn Company, plaintiffs gave the defendant a license and took a decree declaring solemnly that the patent was valid and infringed and directed that $25,000 be paid to plaintiffs. Before the judge had ever seen or put his ink on the decree, there was an agreement signed and a satisfaction of the $25,000 signed. The decree was just window dressing and did not represent the situation.

There is nothing in all of their history which helps these patents.

I will dispose of these patents just as I would an ordinary patent. Plaintiffs are not entitled to have anything read into these patents more than with the ordinary paper patent.

Now as to the Henry patent 1,548,465, this is a process patent for using an elastic roll to put a wood grain pattern on a surface hard enough to receive it. The natural wood is first stained, then photographed, and copper plates are produced from the photographs by the photogravure process. If the Henry patent is good, and defendant had used it on linoleum and was here saying, "Why, this patent says for a hard surface and we put it onto our linoleum," I would not permit it to escape infringement on the theory that its surface

was linoleum, and the surface of linoleum is not hard.

I find that they did exactly the same thing at Cott-a-lap. The Henry process looks so near like the Cott-a-lap process that I cannot find any worthwhile difference between the Henry patent and what Cott-a-lap did. One of the two distinctions which plaintiffs attempt to make is that linoleum does not have a hard surface. One should not be granted a patent because he puts the wood grain onto steel or something a little bit harder than linoleum if it is done in the same old way. What is meant by a hard surface was a surface hard enough so that you could use the process. It makes no difference because Cott-a-lap retouched the negatives a little bit and etched deeper. It is immaterial how the natural wood was prepared, by stain or otherwise, before its picture was taken.

We find every step and division of the so-called Henry process at Cott-a-lap. Oxford bought that engraving department from Cott-a-lap and continued to operate it.

The first step of Henry is to stain the wood. Well, they have stained wood from time immemorial. Every country painter and every city painter and every farmer knows that you could stain your wood. You stain it in many ways. Henry uses much language about staining wood but gives no new information on the subject.

Henry uses the photogravure process to take his picture and get his copper roll made. Henry followed every step, just exactly like they had always done to get a copper roll, and all of his talk about the high and the low lights and how the etching fluid eats into the copper, the screen, the negative, the positive, and every step, sounds ponderous and is, in fact, very wonderful, but every bit of it was very old.

Then after he gets his copper roll, he uses it from then on just like it had long been used. He picks the ink off the copper platen roll with the soft transfer roll and then transfers it to the work.

They had already been taking pictures of wood. A good patent could be obtained for a new method of taking pictures, but should not be granted if the method was old, even if a new subject was found. The most plaintiffs claim is that natural wood was a new subject, but, even as to the subject, we find it was old.

McIndoe 295,658 of March 25, 1884, proposed to photograph natural wood and so did the British patent to Gray 15,291 of 1910. Gray proposed preparing from this photograph an engraved copper roll for printing an exact reproduction of the wood grain on linoleum.

The Charles W. Shonk Company of Maywood, Illinois, a division of the American Can Company, photographed filled natural wood and prepared lithograph plates from which offset printing was done on sheet metal to make a wood grain background for whiskey and soda water advertising plaques and trays. This occurred in 1913 and 1914.

The Magill Weinsheimer Company of Chicago, Illinois, printed, with offset rolls, mahogany grain on the covers of the 1915 International Harvester Company almanacs. The records show that these were printed in the fall of 1914. They photographed stained natural wood but the printing was done with lithograph plates and not by the photogravure method.

The American Art Works at Coshocton, Ohio, made lithograph stones bearing a walnut design in 1913. Some of the witnesses testified they believed that these walnut stones were made from the photograph of a walnut panel. The American Art Works printed these wood grain designs by the lithograph process—offset printing on metal plates for advertisements of pianos, liquors, etc. This was done in 1914 and the following years.

The Nashua Gummed and Coated Paper Company of Nashua, New Hampshire, began printing wood grain designs directly on paper from copper rolls made by the photogravure process by Charles P. Stirling as early as 1909. Stirling testified that he did not photograph natural wood but photographed a wood grain printed on paper that was furnished him by the Nashua Company.

Even without Cott-a-lap, I would hold the same on this prior art—that there was not room enough for this patent. The whole story had been told by publications, prior uses, and in the patents.

One can see how lacking in worth this patent is, and what bad arguments have to be made in order to support it. We have before us two pieces of mahogany, one of them the genuine wood and the other is the imitation on the metal. To look at them

casually, one cannot tell the genuine from the imitation. The theory of novelty in the Henry patent is so unusual and strained that if we take that piece of metal and by this Henry method make as good a picture from the metal as we would by using the genuine mahogany as the subject, the plaintiffs are forced to admit that we have not really used the patented process or infringed, because the subject photographed is not natural wood.

In substance, plaintiffs claim that "if you do not get an exact likeness of your wood, you have not used Henry." That brings out one of the troubles of this patent. You can read it all through and you cannot find in what respect it differs from the prior art. When pressed to find a difference, about all that can be said for it is, "It makes something just like the natural wood." A patent like that is not good. A valid patent can be infringed by a poor workman who does a poor job. Patents are not the sort of thing that, if you do a good job you infringe, and if you do a poor job you do not infringe. The masterpiece of mahogany that I have been talking about is the work of the good mechanic. It was not a different process that made that so perfect. I have seen many products made by the so-called Henry process that I can distinguish from the natural wood.

You can read this record from beginning to end and you will find no lucid explanation of anything new or novel in this Henry patent.

The average person is not going to know about the photogravure process and, therefore, will be likely to think Henry is something wonderful until they find out how old it all is.

■ Now, I will come to this second patent 1,807,894 to Casto and Lang. Claim 14 covers anything in the world if the roll hits the work carriage before the roll hits the work. These transfer rolls are soft and they are old. It was old to hold the work on a tray. The patent rounds the forward edge of the tray. As this roll will first hit that tray, the tray takes a little bit of the shock of the soft roll so that it rolls up onto the work without wearing out the roll so fast.

A court would not need any showing of prior art to hold that void. Any person who has eyes has seen many things protected in that way. When driving our automobile with a soft tire, we can jam it right up over the curb, or we can have a ramp built so we come up gradually.

That is the reason we put stairs in a house, so we do not have to jump clear upstairs at one step. We round off the edge of the steps so we will not stub our toes and hurt our feet. One of the old reasons why we round things off is to give protection. I am not going to bother to find a way of saying defendant's machines did not infringe because there is nothing in front of defendant's work. In defendant's tray, the protecting portion does not come up in front of the work, but the rounding off does extend down far enough so that they use this rounding feature. It is such a worthless claim that I would rather kill it than say it was not infringed. I hold it void as lacking in anything but the simplest mechanical expediency. It would not require a skilled mechanic to think of rounding off the sharp corners, but just a "dumb" mechanic. (See also Sheehan 676,921, June 25, 1901).

I do not know that I can find any stronger language to minimize the worth of claim 25 than I used with reference to claim 14.

The idea of claim 25 and similar claims is to provide a support for the work, if the work is not rigid enough to serve as its own support. If you have something that will yield, you want to hold it in every place where you are going to hit it. We all know that. If you are going to nail something into the wall between the studs, you have to hold the flat-iron back of where you are going to nail, or the plaster will break and go to pieces.

If you are going to press your pants, you have to have something to hold up on the under side of the leg while you put the flat-iron over it. It will not stand up in the air. If you have an uneven surface to work on, then you want to have something to hold it in every place. On the other hand, if it is strong enough, you do not have to. (Note the Jobst patent 1,661,178, March 6, 1928). Patent 1,807,894 is void as to all the claims that are in suit.

■ Patent 1,900,030 is on a machine for graining hollow articles. All they did is to tip the roll up vertically, and, because it was up vertically, they needed a table for the work to run out on. No ingenuity about it at all. No novelty about it. (See Mack 1,527,365, February 24, 1925, and Peckham 484,918, October 25, 1892.)

The claims are top-heavy with that table. The Lord made the earth for things to rest on. And if one puts this machine down near the ground he can use the ground. They talk about a plane. The ground is a plane. All there is to it is letting this work, as it goes through, kick around on the table where it wants to go.

Since they began to do work of any kind, I do not care whether it is weaving cloth, or printing a Sunday paper, or making paper from the pulp into the rolled out paper, or planing lumber or sawing lumber, or grooving lumber, or rolling out steel, when the end gets so heavy that it cannot carry itself out, it has to rest on something. I have seen many peculiar-shaped things to carry it away. We have the old straw carrier that takes it up into the stack. We have the carriage that carries the lumber away from the saw. We have the table that carries the grain from the reaping knife as it cuts it and carries it up and binds it. We have many kinds of carriers. But the simplest kind of a carrier that there is, without wheels, without tracks, and without anything, is the plane. You just let the work slide off and go where it wants to, and that is what this patent uses.

Sometimes simplicity denotes the greatest invention. But this is not invention. They have been doing things that way always—by letting them run through the wringer, or anything else. That is all this did. Around it goes, where it wants to on the support. You support it against gravity, that is all.

There is no invention in taking a horizontal roll that is doing the same thing (see Comp 1,360,723, November 30, 1920, and Nagy 1,487,591, March 18, 1924) and tipping the whole thing so it is vertical, and when it is vertical, letting the work run through on a table.

The doctor blade and the ink pump are as old as can be, British patent to Crete, 17,661 of 1914, Mack 1,527,365, February 24, 1925, Sheetz 769,499, September 6, 1904, and the German patent 279,952.

All the claims in suit of this patent are void.

Now, I come to the last patent, 1,-946,483, and that is a process patent. We are getting the road so tracked up with these trivial patents that business is just trembling to move for fear somebody is going to sue it. We not only have a me-chanical patent on the machine, but a process patent to go with it. This patent is the process for the other patent I have just held void. There are horizontal rolls, as well as vertical rolls, shown in the process patent.

Claim 1 calls for:

"A method of decorating the surfaces of articles having relatively *abrupt* bends."

No one has been able to tell me what is meant in this patent by an "abrupt bend". If I should hold this claim valid, then nobody would ever be able to tell when it was infringed. That was one of the troubles in the balloon tire case, Steel Wheel Corp. v. B. F. Goodrich Rubber Co., D.C., 27 F.2d 427; Id., 6 Cir., 42 F.2d 406. Some of the over-sized tires before they had balloon tires were bigger than the small balloon tires, and how were you going to tell a balloon tire? How could anyone tell when this claim 1 of patent 1,946,483 was infringed? We had some very abrupt bends in the prior art.

The defendant is graining the inside of the work, and these applicants never did tell anybody how they were going to get into the inside of the work and do the job. The fact is, from anything they have shown or told us about, they could not. You take the very kind of work they show us here in their drawings and you could not get inside to do it. You cannot get up into the corners on the inside with the roll. You cannot have a square corner. You cannot have a 90-degree bend. You cannot have it that abrupt and use any roll they have shown here to get up into the corner. You are going to have a place that is not grained. In the prior art, they have been printing the work inside and outside.

What I have said above regarding the machine patent 1,900,030 regarding novelty and invention applies equally well to the process patent 1,946,483. In fact, the process claims are even broader than the claims in the machine patent. Claim 1 of the process patent is not even limited to vertical rolls but covers both horizontal or vertical rolls. The other claim in suit, claim 4, is a very broad claim calling for supporting the entire weight of the article on the guide and decorating surfaces deviating from a single plane. This means decorating any surface which is not a single, flat plane. Anything that is round or bent or crooked in any way comes within this designation. For the reasons that I have already given

572

in connection with the corresponding machine patent, these claims do not represent a patentable invention and I hold claims 1 and 4 in suit void.

The prior art relied upon by the defendants, such as the Silver patent 805,100, November 21, 1905, the Brausil patent 590,-200, September 14, 1897, Norwegian patent to Brausil 5,614 of 1897, the Peckham patent 484,918, October 25, 1892, De Tamble 572,197, December 1, 1896, and the Purdy patent 569,054, October 6, 1896, comes pretty close to literally anticipating the claims in suit. Certainly it negatives any patentable invention.

There is a serious question whether these claims do not cover the mere function of a machine and are, therefore, unpatentable; but as I have already held them void for other reasons, I will not pass on this issue.

I hold every claim here in suit void, and the decree will be in favor of the defendants dismissing the bill, with costs.

This opinion may stand as my findings of fact and conclusions of law as required by Equity Rule 70½, 28 U.S.C.A. following section 723, in accordance with the practice in Briggs v. United States, 6 Cir., 45 F.2d 479.